*523 Justice Breyer
delivered the opinion of the Court.
Section 106 of the Copyright Act grants “the owner of copyright under this title” certain “exclusive rights,” including the right “to distribute copies ... of the copyrighted work to the public by sale or other transfer of ownership.” 17 U. S. C. § 106(3). These rights are qualified, however, by the application of various limitations set forth in the next several sections of the Act, §§ 107 through 122. Those sections, typically entitled “Limitations on exclusive rights,” include, for example, the principle of “fair use” (§ 107), permission for limited library archival reproduction (§ 108), and the doctrine at issue here, the “first sale” doctrine (§ 109).
Section 109(a) sets forth the “first sale” doctrine as follows:
“Notwithstanding the provisions of section 106(3) [the section that grants the owner exclusive distribution rights], the owner of a particular copy or phonorecord lawfully made under this title ... is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorec-ord.” (Emphasis added.)
*524 Thus, even though § 106(3) forbids distribution of a copy of, say, the copyrighted novel Herzog without the copyright owner’s permission, § 109(a) adds that, once a copy of Herzog has been lawfully sold (or its ownership otherwise lawfully transferred), the buyer of that copy and subsequent owners are free to dispose of it as they wish. In copyright jargon, the “first sale” has “exhausted” the copyright owner’s § 106(3) exclusive distribution right.
What, however, if the copy of Herzog was printed abroad and then initially sold with the copyright owner’s permission? Does the “first sale” doctrine still apply? Is the buyer, like the buyer of a domestically manufactured copy, free to bring the copy into the United States and dispose of it as he or she wishes?
To put the matter technically, an “importation” provision, § 602(a)(1), says that
“[importation into the United States, without the authority of the owner of copyright under this title, of copies ... of a work that have been acquired outside the United States is an infringement of the exclusive right to distribute copies . . . under section 106 . . . 17 U. S. C. § 602(a)(1) (2006 ed., Supp. V) (emphasis added).
Thus § 602(a)(1) makes clear that importing a copy without permission violates the owner’s exclusive distribution right. But in doing so, § 602(a)(1) refers explicitly to the §106(3) exclusive distribution right. As we have just said, § 106 is by its terms “[sjubject to” the various doctrines and principles contained in §§ 107 through 122, including § 109(a)’s “first sale” limitation. Do those same modifications apply—in particular, does the “first sale” modification apply—when considering whether § 602(a)(1) prohibits importing a copy?
In Quality King Distributors, Inc. v. Danza Research Int’l, Inc., 523 U. S. 135, 145 (1998), we held that §602(a)(l)’s reference to § 106(3)’s exclusive distribution right incorporates the later subsections’ limitations, including, in particular, the “first sale” doctrine of § 109. Thus, it might seem *525 that, § 602(a)(1) notwithstanding, one who buys a copy abroad can freely import that copy into the United States and dispose of it, just as he could had he bought the copy in the United States.
But Quality King considered an instance in which the copy, though purchased abroad, was initially manufactured in the United States (and then sent abroad and sold). This case is like Quality King but for one important fact. The copies at issue here were manufactured abroad. That fact is important because § 109(a) says that the “first sale” doctrine applies to “a particular copy or phonorecord lawfully made under this title.” And we must decide here whether the five words, “lawfully made under this title,” make a critical legal difference.
Putting section numbers to the side, we ask whether the “first sale” doctrine applies to protect a buyer or other lawful owner of a copy (of a copyrighted work) lawfully manufactured abroad. Can that buyer bring that copy into the United States (and sell it or give it away) without obtaining permission to do so from the copyright owner? Can, for example, someone who purchases, say, at a used bookstore, a book printed abroad subsequently resell it without the copyright owner’s permission?
In our view, the answers to these questions are, yes. We hold that the “first sale” doctrine applies to copies of a copyrighted work lawfully made abroad.
I
A
Respondent, John Wiley & Sons, Inc., publishes academic textbooks. Wiley obtains from its authors various foreign and domestic copyright assignments, licenses, and permissions—to the point that we can, for present purposes, refer to Wiley as the relevant American copyright owner. See 654 F. 3d 210, 213, n. 6 (CA2 2011). Wiley often assigns to its wholly owned foreign subsidiary, John Wiley & Sons (Asia) Pte Ltd., rights to publish, print, and sell Wiley’s *526 English-language textbooks abroad. App. to Pet. for Cert. 47a-48a. Each copy of a Wiley Asia foreign edition will likely contain language making clear that the copy is to be sold only in a particular country or geographical region outside the United States. 654 F. 3d, at 213.
For example, a copy of Wiley’s American edition says: “Copyright © 2008 John Wiley & Sons, Inc. All rights reserved. . . . Printed in the United States of America.” J. Walker, Fundamentals of Physics, p. vi (8th ed. 2008). A copy of Wiley Asia’s Asian edition of that book says:
“Copyright © 2008 John Wiley & Sons (Asia) Pte Ltd[.] All rights reserved. This book is authorized for sale in Europe, Asia, Africa, and the Middle East only and may be not exported [sic] out of these territories. Exportation from or importation of this book to another region without the Publisher’s authorization is illegal and is a violation of the Publisher’s rights. The Publisher may take legal action to enforce its rights. . . . Printed in Asia.” J. Walker, Fundamentals of Physics, p. vi (8th ed. 2008 Wiley Int’l Student ed.).
Both the foreign and the American copies say:
“No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means . . . except as permitted under Sections 107 or 108 of the 1976 United States Copyright Act.” Compare, e.g., ibid. (Int’l ed.) with Walker, supra, at vi (American ed.).
The upshot is that there are two essentially equivalent versions of a Wiley textbook, 654 F. 3d, at 213, each version manufactured and sold with Wiley’s permission: (1) an American version printed and sold in the United States, and (2) a foreign version manufactured and sold abroad. And Wiley makes certain that copies of the second version state that they are not to be taken (without permission) into the United States. Ibid.
*527 Petitioner, Supap Kirtsaeng, a citizen of Thailand, moved to the United States in 1997 to study mathematics at Cornell University. Ibid. He paid for his education with the help of a Thai Government scholarship which required him to teach in Thailand for 10 years on his return. Brief for Petitioner 7. Kirtsaeng successfully completed his undergraduate courses at Cornell, successfully completed a Ph. D. program in mathematics at the University of Southern California, and then, as promised, returned to Thailand to teach. Ibid. While he was studying in the United States, Kirtsaeng asked his friends and family in Thailand to buy copies of foreign edition English-language textbooks at Thai bookshops, where they sold at low prices, and mail them to him in the United States. Id., at 7-8. Kirtsaeng would then sell them, reimburse his family and friends, and keep the profit. App. to Pet. for Cert. 48a-49a.
B
In 2008 Wiley brought this federal lawsuit against Kirt-saeng for copyright infringement. 654 F. 3d, at 213. Wiley claimed that Kirtsaeng’s unauthorized importation of its books and his later resale of those books amounted to an infringement of Wiley’s § 106(3) exclusive right to distribute as well as § 602’s related import prohibition. 17 U. S. C. §§ 106(3) (2006 ed.), 602(a) (2006 ed., Supp. V). See also § 501 (2006 ed.) (authorizing infringement action). App. 204-211. Kirtsaeng replied that the books he had acquired were “ ‘lawfully made’” and that he had acquired them legitimately. Record in No. l:08-CV-7834-DCP (SDNY), Doc. 14, p. 3. Thus, in his view, §109(a)’s “first sale” doctrine permitted him to resell or otherwise dispose of the books without the copyright owner’s farther permission. Id., at 2-3.
The District Court held that Kirtsaeng could not assert the “first sale” defense because, in its view, that doctrine does not apply to “foreign-manufactured goods” (even if made abroad with the copyright owner’s permission). App. *528 to Pet. for Cert. 72a. The jury then found that Kirtsaeng had willfully infringed Wiley’s American copyrights by selling and importing without authorization copies of eight of Wiley’s copyrighted titles. And it assessed statutory damages of $600,000 ($75,000 per work). 654 F. 3d, at 215.
On appeal, a split panel of the Second Circuit agreed with the District Court. Id., at 222. It pointed out that § 109(a)’s “first sale” doctrine applies only to “the owner of a particular copy ... lawfully made under this title” Id., at 218-219, and n. 27 (emphasis added). And, in the majority’s view, this language means that the “first sale” doctrine does not apply to copies of American copyrighted works manufactured abroad. Id., at 221. A dissenting judge thought that the words “lawfully made under this title” do not refer “to a place of manufacture” but rather “focu[s] on whether a particular copy was manufactured lawfully under” America’s copyright statute, and that “the lawfulness of the manufacture of a particular copy should be judged by U. S. copyright law.” Id., at 226 (opinion of Murtha, J.).
We granted Kirtsaeng’s petition for certiorari to consider this question in light of different views among the Circuits. Compare id., at 221 (case below) (“first sale” doctrine does not apply to copies manufactured outside the United States), with Omega S. A. v. Costco Wholesale Corp., 541 F. 3d 982, 986 (CA9 2008) (“first sale” doctrine applies to copies manufactured outside the United States only if an authorized first sale occurs within the United States), aff’d by an equally divided court, 562 U. S. 40 (2010), and Sebastian Int’l, Inc. v. Consumer Contacts (PTY) Ltd., 847 F. 2d 1093, 1098, n. 1 (CA3 1988) (limitation of the first sale doctrine to copies made within the United States “does not fit comfortably within the scheme of the Copyright Act”).
I I
We must decide whether the words lawfully made under this title” restrict the scope of § 109(a)’s “first sale” doctrine geographically. The Second Circuit, the Ninth Circuit, *529 Wiley, and the Solicitor General (as amicus) all read those words as imposing a form of geographical limitation. The Second Circuit held that they limit the “first sale” doctrine to particular copies “made in territories in which the Copyright Act is law,” which (the Circuit says) are copies “manufactured domestically,” not “outside of the United States.” 654 F. 3d, at 221-222 (emphasis added). Wiley agrees that those five words limit the “first sale” doctrine “to copies made in conformance with the [United States] Copyright Act where the Copyright Act is applicable,” which (Wiley says) means it does not apply to copies made “outside the United States” and at least not to “foreign production of a copy for distribution exclusively abroad.” Brief for Respondent 15-16. Similarly, the Solicitor General says that those five words limit the “first sale” doctrine’s applicability to copies ‘“made subject to and in compliance with [the Copyright Act],’ ” which (the Solicitor General says) are copies “made in the United States.” Brief for United States as Amicus Curiae 5 (hereinafter Brief for United States) (emphasis added). And the Ninth Circuit has held that those words limit the “first sale” doctrine’s applicability (1) to copies lawfully made in the United States, and (2) to copies lawfully made outside the United States but initially sold in the United States with the copyright owner’s permission. Den-bicare U. S. A. Inc. v. Toys “R” Us, Inc., 84 F. 3d 1143, 1149-1150 (1996).
Under any of these geographical interpretations, § 109(a)’s “first sale” doctrine would not apply to the Wiley Asia books at issue here. And, despite an American copyright owner’s permission to make copies abroad, one who buys a copy of any such book or other copyrighted work—whether at a retail store, over the Internet, or at a library sale—could not resell (or otherwise dispose of) that particular copy without further permission.
Kirtsaeng, however, reads the words “lawfully made under this title” as imposing a wow-geographical limitation. He says that they mean made “in accordance with” or “in com *530 pliance with” the Copyright Act. Brief for Petitioner 26. In that case, § 109(a)’s “first sale” doctrine would apply to copyrighted works as long as their manufacture met the requirements of American copyright law. In particular, the doctrine would apply where, as here, copies are manufactured abroad with the permission of the copyright owner. See § 106 (referring to the owner’s right to authorize).
In our view, § 109(a)’s language, its context, and the common-law history of the “first sale” doctrine, taken together, favor a ?wm-geographical interpretation. We also doubt that Congress would have intended to create the practical copyright-related harms with which a geographical interpretation would threaten ordinary scholarly, artistic, commercial, and consumer activities. See Part II-D, infra. We consequently conclude that Kirtsaeng’s nongeographical reading is the better reading of the Act.
A
The language of § 109(a) read literally favors Kirtsaeng’s nongeographical interpretation, namely, that “lawfully made under this title” means made “in accordance with” or “in compliance with” the Copyright Act. The language of § 109(a) says nothing about geography. The word “under” can mean “[i]n accordance with.” 18 Oxford English Dictionary 950 (2d ed. 1989). See also Black’s Law Dictionary 1525 (6th ed. 1990) (“according to”). And a nongeographical interpretation provides each word of the five-word phrase with a distinct purpose. The first two words of the phrase, “lawfully made,” suggest an effort to distinguish those copies that were made lawfully from those that were not, and the last three words, “under this title,” set forth the standard of “lawful[ness].” Thus, the nongeographical reading is simple, it promotes a traditional copyright objective (combating piracy), and it makes word-by-word linguistic sense.
The geographical interpretation, however, bristles with linguistic difficulties. It gives the word “lawfully” little, if *531 any, linguistic work to do. (How could a book be %%-lawfully “made under this title”?) It imports geography into a statutory provision that says nothing explicitly about it. And it is far more complex than may at first appear.
To read the clause geographically, Wiley, like the Second Circuit and the Solicitor General, must first emphasize the word “under.” Indeed, Wiley reads “under this title” to mean “in conformance with the Copyright Act where the Copyright Act is applicable.” Brief for Respondent 15. Wiley must then take a second step, arguing that the Act “is applicable” only in the United States. Ibid. And the Solicitor General must do the same. See Brief for United States 6 (“A copy is ‘lawfully made under this title’ if Title 17 governs the copy’s creation and the copy is made in compliance with Title 17’s requirements”). See also post, at 562 (Ginsburg, J., dissenting) (“under” describes something “governed or regulated by another”).
One difficulty is that neither “under” nor any other word in the phrase means “where.” See, e. g., 18 Oxford English Dictionary, supra, at 947-952 (definition of “under”). It might mean “subject to,” see post, at 561-562, but as this Court has repeatedly acknowledged, , the word evades a uniform, consistent meaning. See Kucana v. Holder, 558 U. S. 233, 245 (2010) (“‘under’ is chameleon”); Ardestani v. INS, 502 U. S. 129, 135 (1991) (“under” has “many dictionary definitions” and “must draw its meaning from its context”).
A far more serious difficulty arises out of the uncertainty and complexity surrounding the second step’s effort to read the necessary geographical limitation into the word “applicable” (or the equivalent). Where, precisely, is the Copyright Act “applicable”? The Act does not instantly protect an American copyright holder from unauthorized piracy taking place abroad. But that fact does not mean the Act is inapplicable to copies made abroad. As a matter of ordinary English, one can say that a statute imposing, say, a tariff upon “any rhododendron grown in Nepal” applies to all *532 Nepalese rhododendrons. And, similarly, one can say that the American Copyright Act is applicable to all pirated copies, including those printed overseas. Indeed, the Act itself makes clear that (in the Solicitor General’s language) foreign-printed pirated copies are “subject to” the Act. § 602(a)(2) (2006 ed., Supp. V) (referring to importation of copies “the making of which either constituted an infringement of copyright, or which would have constituted an infringement of copyright if this title had been applicable”); Brief for United States 5. See also post, at 561 (suggesting that “made under” may be read as “subject to”).
The appropriateness of this linguistic usage is underscored by the fact that § 104 of the Act itself says that works “subject to protection under this title” include unpublished works “without regard to the nationality or domicile of the author” and works “first published” in any one of the nearly 180 nations that have signed a copyright treaty with the United States. §§ 104(a), (b) (2006 ed.) (emphasis added); § 101 (2006 ed., Supp. V) (defining “treaty party”); U. S. Copyright Office, Circular No. 38A, International Copyright Relations of the United States (2010). Thus, ordinary English permits us to say that the Act “applies” to an Irish manuscript lying in its author’s Dublin desk drawer as well as to an original recording of a ballet performance first made in Japan and now on display in a Kyoto art gallery. Cf. 4 M. Nimmer & D. Nimmer, Copyright § 17.02, pp. 17-18, 17-19 (2012) (hereinafter Nimmer on Copyright) (noting that the principle that “copyright laws do not have any extraterritorial operation” “requires some qualification”).
The Ninth Circuit’s geographical interpretation produces still greater linguistic difficulty. As we said, that Circuit interprets the “first sale” doctrine to cover both (1) copies manufactured in the United States and (2) copies manufactured abroad but first sold in the United States with the American copyright owner’s permission. Denbicare U. S. A., 84 F. 3d, at 1149-1150. See also Brief for Respond *533 ent 16 (suggesting that the clause at least excludes “the foreign production of a copy for distribution exclusively abroad”); id., at 51 (the Court need “not decide whether the copyright owner would be able, to restrict further distribution” in the case of “a downstream domestic purchaser of authorized imports”); Brief for Petitioner in Costco Wholesale Corp. v. Omega, S. A., O. T. 2010, No. 08-1423, p. 12 (excepting imported copies “made by unrelated foreign copyright holders” (emphasis deleted)).
We can understand why the Ninth Circuit may have thought it necessary to add the second part of its definition. As we shall later describe, see Part II-D, infra, without some such qualification a copyright holder could prevent a buyer from domestically reselling or even giving away copies of a video game made in Japan, a film made in Germany, or a dress fabric (with a design copyright) made in China, even if the copyright holder has granted permission for the foreign manufacture, importation, and an initial domestic sale of the copy. A publisher such as Wiley would be free to print its books abroad, allow their importation and sale within the United States, but prohibit students from later selling their used texts at a campus bookstore. We see no way, however, to reconcile this half-geographical/half-non-geographical interpretation with the language of the phrase, “lawfully made under this title.” As a matter of English, it would seem that those five words either do cover copies lawfully made abroad or they do not.
In sum, we believe that geographical interpretations create more linguistic problems than they resolve. And considerations of simplicity and coherence tip the purely linguistic balance in Kirtsaeng’s, nongeographical, favor.
B
Both historical and contemporary statutory context indicate that Congress, when writing the present version of § 109(a), did not have geography in mind. In respect to his *534 tory, we compare § 109(a)’s present language with the language of its immediate predecessor. That predecessor said:
“[NJothing in this Act shall be deemed to forbid, prevent, or restrict the transfer of any copy of a copyrighted work the possession of which has been lawfully obtained.” Copyright Act of 1909, §41, B5 Stat. 1084 (emphasis added).
See also Copyright Act of 1947, §27, 61 Stat. 660. The predecessor says nothing about geography (and Wiley does not argue that it does). So we ask whether Congress, in changing its language, implicitly introduced a geographical limitation that previously was lacking. See also Part II-C, infra (discussing 1909 codification of common-law principle).
A comparison of language indicates that it did not. The predecessor says that the “first sale” doctrine protects “the transfer of any copy the possession of which has been lawfully obtained” The present version says that “the owner of a particular copy or phonorecord lawfully made under this title is entitled to sell or otherwise dispose of the possession of that copy or phonorecord.” What does this change in language accomplish?
The language of the former version referred to those who are not owners of a copy, but mere possessors who “lawfully obtained” a copy. The present version covers only those who are owners of a “lawfully made” copy. Whom does the change leave out? Who might have lawfully obtained a copy of a copyrighted work but not owned that copy? One answer is owners of movie theaters, who during the 1970⅛ (and before) often leased films from movie distributors or filmmakers. See S. Donahue, American Film Distribution 134, 177 (1987) (describing producer-distributer and distributer-exhibitor agreements); Note, The Relationship Between Motion Picture Distribution and Exhibition: An Analysis of the Effects of Anti-Blind Bidding Legislation, 9 Comm/Ent. L. J. 131, 135 (1986). Because the theater owners had “lawfully *535 obtained” their copies, the earlier version could be read as allowing them to sell that copy, i. e., it might have given them “first sale” protection. Because the theater owners were lessees, not owners, of their copies, the change in language makes clear that they (like bailees and other lessees) cannot take advantage of the “first sale” doctrine. (Those who find legislative history useful will find confirmation in, e. g., House Committee on the Judiciary, Copyright Law Revision, Supplementary Report of the Register of Copyrights on the General Revision of the U. S. Copyright Law: 1965 Revision Bill, 89th Cong., 1st Sess., pt. 6, p. 30 (Comm. Print 1965) (hereinafter Copyright Law Revision) (“[W]here a person has rented a print of a motion , picture from the copyright owner, he would have no right to lend, rent, sell, or otherwise dispose of the print without first obtaining the copyright owner’s permission”). See also Platt & Munk Co. v. Republic Graphics, Inc., 315 F. 2d 847, 851 (CA2 1963) (Friendly, J.) (pointing out predecessor statute’s leasing problem).)
This objective perfectly well explains the new language of the present version, including the five words here at issue. Section 109(a) now makes clear that a lessee of a copy will not receive “first sale” protection but one who owns a copy will receive “first sale” protection, provided, of course, that the copy was “lawfully made” and not pirated. The new language also takes into account that a copy may be “lawfully made under this title” when the copy, say, of a phonorec-ord, comes into its owner’s possession through use of a compulsory license, which “this title” provides for elsewhere, namely, in § 115. Again, for those who find legislative history useful, the relevant legislative Report makes this clear. H. R. Rep. No. 94-1476, p. 79 (1976) (“For example, any resale of an illegally ‘pirated’ phonorecord would be an infringement, but the disposition of a phonorecord legally made under the compulsory licensing provisions of section 115 would not”).
*536 Other provisions of the present statute also support a nongeographical interpretation. For one thing, the statute phases out the “manufacturing clause,” a clause that appeared in earlier statutes and had limited importation of many copies (of copyrighted works) printed outside the United States. §601, 90 Stat. 2588 (“Prior to July 1, 1982 . . . the importation into or public distribution in the United States of copies of a work consisting preponderantly of nondramatic literary material ... is prohibited unless the portions consisting of such material have been manufactured in the United States or Canada”). The phasing out of this clause sought to equalize treatment of copies manufactured in America and copies manufactured abroad. See H. R. Rep. No. 94-1476, at 165-166.
The “equal treatment” principle, however, is difficult to square with a geographical interpretation of the “first sale” clause that would grant the holder of an American copyright (perhaps a foreign national, see supra, at 532) permanent control over the American distribution chain (sales, resales, gifts, and other distribution) in respect to copies printed abroad but not in respect to copies printed in America. And it is particularly difficult to believe that Congress would have sought this unequal treatment while saying nothing about it and while, in a related clause (the manufacturing phaseout), seeking the opposite kind of policy goal. Cf. Golan v. Holder, 565 U. S. 302, 333 (2012) (Congress has moved from a copyright regime that, prior to 1891, entirely excluded foreign works from U. S. copyright protection to a regime that now “ensure[s] that most works, whether foreign or domestic, would be governed by the same legal regime” (emphasis added)).
Finally, we normally presume that the words “lawfully made under this title” carry the same meaning when they appear in different but related sections. Department of Revenue of Ore. v. ACF Industries, Inc., 510 U. S. 332, *537 342 (1994). But doing so here produces surprising consequences. Consider:
(1) Section 109(c) says that, despite the copyright owner’s exclusive right “to display” a copyrighted work (provided in §106(5)), the owner of a particular copy “lawfully made under this title” may publicly display it without further authorization. To interpret these words geographically would mean that one who buys a copyrighted work of art, a poster, or even a bumper sticker, in Canada, in Europe, in Asia, could not display it in America without the copyright owner’s further authorization.
(2) Section 109(e) specifically provides that the owner of a particular copy of a copyrighted video arcade game “lawfully made under this title” may “publicly perform or display that game in coin-operated equipment” without the authorization of the copyright owner. To interpret these words geographically means that an arcade owner could not (“without the authority of the copyright owner”) perform or display arcade games (whether new or used) originally made in Japan. Cf. Red Baron-Franklin Park, Inc. v. Taito Corp., 883 F. 2d 275 (CA4 1989).
(3) Section 110(1) says that a teacher, without the copyright owner’s authorization, is allowed to perform or display a copyrighted work (say, an audiovisual work) “in the course of face-to-face teaching activities”—unless the teacher knowingly used “a copy that was not lawfully made under this title.” To interpret these words geographically would mean that the teacher could not (without farther authorization) use a copy of a film during class if the copy was lawfully made in Canada, Mexico, Europe, Africa, or Asia.
(4) In its introductory sentence, §106 provides the Act’s basic exclusive rights to an “owner of a copyright *538 under this title.” The last three words cannot support a geographic interpretation.
Wiley basically accepts the first three readings, but argues that Congress intended the restrictive consequences. And it argues that context simply requires that the words of the fourth example receive a different interpretation. Leaving the fourth example to the side, we shall explain in Part IID, infra, why we find it unlikely that Congress would have intended these and other related consequences.
C
A relevant canon of statutory interpretation favors a non-geographical reading. “[W]hen a statute covers an issue previously governed by the common law,” we must presume that “Congress intended to retain the substance of the common law.” Samantar v. Yousuf, 560 U. S. 305, 320, n. 13 (2010). See also Isbrandtsen Co. v. Johnson, 343 U. S. 779, 783 (1952) (“Statutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident”).
The “first sale” doctrine is a common-law doctrine with an impeccable historic pedigree. In the early 17th century Lord Coke explained the common law’s refusal to permit restraints on the alienation of chattels. Referring to Little-ton, who wrote in the 15th century, Gray, Two Contributions to Coke Studies, 72 U. Chi. L. Rev. 1127, 1135 (2005), Lord Coke wrote:
“[If] a man be possessed of ... a horse, or of any other chattell... and give or sell his whole interest... therein upon condition that the Donee or Vendee shall not alién-tate] the same, the [condition] is voi[d], because his whole interest ... is out of him, so as he hath no possibility] of a Reverter, and it is against Trade and Traffi[e], and bargaining and contracting betwee[n] man and man: and *539 it is within the reason of our Author that it should ouster him of all power given to him.” 1 E. Coke, Institutes of the Laws of England § 360, p. 223 (1628).
A law that permits a copyright holder to control the resale or other disposition of a chattel once sold is similarly “against Trade and Traffi[c], and bargaining and contracting.” Ibid.
With these last few words, Coke emphasizes the importance of leaving buyers of goods free to compete with each other when reselling or otherwise disposing of those goods. American law too has generally thought that competition, including freedom to resell, can work to the advantage of the consumer. See, e. g., Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U. S. 877, 886 (2007) (restraints with “manifestly anticompetitive effects” are per se illegal; others are subject to the rule of reason (internal quotation marks omitted)); 1 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 100, p. 4 (3d ed. 2006) (“[T]he principal objective of antitrust policy is to maximize consumer welfare by encouraging firms to behave competitively”).
The “first sale” doctrine also frees courts from the administrative burden of trying to enforce restrictions upon difficult-to-trace, readily movable goods. And it avoids the selective enforcement inherent in any such effort. Thus, it is not surprising that for at least a century the “first sale” doctrine has played an important role in American copyright law. See Bobbs-Merrill Co. v. Straus, 210 U. S. 339 (1908); Copyright Act of 1909, §41, 35 Stat. 1084. See also Copyright Law Revision, Further Discussions and Comments on Preliminary Draft for Revised U. S. Copyright Law, 88th Cong., 2d Sess., pt. 4, p. 212 (Comm. Print 1964) (Irwin Karp of Authors’ League of America expressing concern for “the very basic concept of copyright law that, once you’ve sold a copy legally, you can’t restrict its resale”).
The common-law doctrine makes no geographical distinctions; nor can we find any in Bobbs-Merrill (where this Court first applied the “first sale” doctrine) or in § 109(a)’s prede *540 cessor provision, which Congress enacted a year later. See supra, at 533. Rather, as the Solicitor General acknowledges, “a straightforward application of Bobbs-Merrill” would not preclude the “first sale” defense from applying to authorized copies made overseas. Brief for United States 27. And we can find no language, context, purpose, or history that would rebut a “straightforward application” of that doctrine here.
The dissent argues that another principle of statutory interpretation works against our reading, and points out that elsewhere in the statute Congress used different words to express something like the nongeographical reading we adopt. Post, at 564 (quoting § 602(a)(2) (prohibiting the importation of copies “the making of which either constituted an infringement of copyright, or which would have constituted an infringement of copyright if this title had been applicable” (emphasis deleted))). Hence, Congress, the dissent believes, must have meant § 109(a)’s different language to mean something different (such as the dissent’s own geographical interpretation of § 109(a)). We are not aware, however, of any canon of interpretation that forbids interpreting different words used in different parts of the same statute to mean roughly the same thing. Regardless, were there such a canon, the dissent’s interpretation of § 109(a) would also violate it. That is because Congress elsewhere in the 1976 Act included the words “manufactured in the United States or Canada,” 90 Stat. 2588, which express just about the same geographical thought that the dissent reads into § 109(a)’s very different language.
D
Associations of libraries, used-book dealers, technology companies, consumer-goods retailers, and museums point to various ways in which a geographical interpretation would fail to further basic constitutional copyright objectives, in particular “promot[ing] the Progress of Science and useful Arts.” U. S. Const., Art. I, §8, cl. 8.
*541 The American Library Association tells us that library collections contain at least 200 million books published abroad (presumably, many were first published in one of the nearly 180 copyright-treaty nations, and,enjoy American copyright protection under 17 U. S. C. § 1Ó4, see supra, at 532); that many others were first published in the United States but printed abroad because of lower costs; and that a geographical interpretation will likely require the libraries to obtain permission (or at least create significant uncertainty) before circulating or otherwise distributing these books. Brief for American Library Association et al. as Amici Curiae 4, 15-20. Cf. id., at 16-20, 28 (discussing limitations of potential defenses, including the fair use and archival exceptions, §§ 107-108). See also Library and Book Trade Almanac 511 (D. Bogart ed., 55th ed. 2010) (during 2000-2009 “a significant amount of book printing moved to foreign nations”).
How, the American Library Association asks, are the libraries -to obtain permission to distribute these millions of books? How can they find, say, the copyright owner of a foreign book, perhaps written decades ago? They may not know the copyright holder’s present address. Brief for American Library Association 15 (many books lack indication of place of manufacture; “no practical way to learn where [a] book was printed”). And, even where addresses can be found, the costs of finding them, contacting owners, and negotiating may be high indeed. Are the libraries to stop circulating or distributing or displaying the millions of books in their collections that were printed abroad?
Used-book dealers tell us that, from the time when Benjamin Franklin and Thomas Jefferson built commercial and personal libraries of foreign books, American readers have bought used books published and printed abroad. Brief for Powell’s Books Inc. et al. as Amici Curiae 7 (citing M. Stern, Antiquarian Bookselling in the United States (1985)). The dealers say that they have “operat[ed] ... for centuries” under the assumption that the “first sale” doctrine applies. *542 Brief for Powell’s Books 7. But under a geographical interpretation a contemporary tourist who buys, say, at Shakespeare and Co. (in Paris), a dozen copies of a foreign book for American friends might find that she had violated the copyright law. The used-book dealers cannot easily predict what the foreign copyright holder may think about a reader’s effort to sell a used copy of a novel. And they believe that a geographical interpretation will injure a large portion of the used-book business.
Technology companies tell us that “automobiles, microwaves, calculators, mobile phones, tablets, and personal computers” contain copyrightable software programs or packaging. Brief for Public Knowledge et al. as Amici Curiae 10. See also Brief for Association of Service and Computer Dealers International, Inc., as Amicus Curiae 2. Many of these items are made abroad with the American copyright holder’s permission and then sold and imported (with that permission) to the United States. Brief for Retail Litigation Center, Inc., et al. as Amici Curiae 4. A geographical interpretation would prevent the resale of, say, a car, without the permission of the holder of each copyright on each piece of copyrighted automobile software. Yet there is no reason to believe that foreign auto manufacturers regularly obtain this kind of permission from their software component suppliers, and Wiley did not indicate to the contrary when asked. See Tr. of Oral Arg. 29-30. Without that permission a foreign car owner could not sell his or her used car.
Retailers tell us that over $2.3 trillion worth of foreign goods were imported in 2011. Brief for Retail Litigation Center 8. American retailers buy many of these goods after a first sale abroad. Id., at 12. And, many of these items bear, carry, or contain copyrighted “packaging, logos, labels, and product inserts and instructions for [the use of] everyday packaged goods from floor cleaners and health and beauty products to breakfast cereals.” Id., at 10-11. The *543 retailers add that American sales of more traditional copyrighted works, “such as books, recorded music, motion pictures, and magazines,” likely amount to over $220 billion. Id., at 9. See also id., at 10 (electronic game industry is $16 billion). A geographical interpretation would subject many, if not all, of them to the disruptive impact of the threat of infringement suits. Id., at 12.
Art museum directors ask us to consider their efforts to display foreign-produced works by, say, Cy Twombly, René Magritte, Henri Matisse, Pablo Picasso, and others. See su-pra, at 532 (describing how § 104 often makes such works “subject to” American copyright protection). A geographical interpretation, they say, would require the museums to obtain permission from the copyright owners before they could display the work, see supra, at 537—even if the copyright owner has already sold or donated the work to a foreign museum. Brief for Association of Art Museum Directors et al. as Amici Curiae 10-11. What are the museums to do, they ask, if the artist retained the copyright, if the artist cannot be found, or if a group of heirs is arguing about who owns which copyright? Id., at 14.
These examples, and others previously mentioned, help explain why Lord Coke considered the “first sale” doctrine necessary to protect “Trade and Traffi[c], and bargaining and contracting,” and they help explain why American copyright law has long applied that doctrine. Cf. supra, at 538-539.
Neither Wiley nor any of its many amici deny that a geographical interpretation could bring about these “horri-bles”—at least in principle. Rather, Wiley essentially says that the list is artificially invented. Brief for Respondent 51-52. It points out that a federal court first adopted a geographical interpretation more than 30 years ago. CBS, Inc. v. Scorpio Music Distributors, Inc., 569 F. Supp. 47, 49 (ED Pa. 1983), summarily aff’d, 738 F. 2d 424 (CA3 1984) (table). Yet, it adds, these problems have not occurred. Why not? Because, says Wiley, the problems and threats are purely *544 theoretical; they are unlikely to reflect reality. See also post, at 585-586.
We are less sanguine. For one thing, the law has not been settled for long in Wiley’s favor. The Second Circuit, in its decision below, is the first Court of Appeals to adopt a purely geographical interpretation. The Third Circuit has favored a nongeographical interpretation. Sebastian Int’l, 847 F. 2d 1093. The Ninth Circuit has favored a modified geographical interpretation with a nongeographical (but textually unsustainable) corollary designed to diminish the problem. Denbicare U. S. A., 84 F. 3d 1143. See supra, at 532-533. And other courts have • hesitated to adopt, and have cast doubt upon, the validity of the geographical interpretation. Pearson Educ., Inc. v. Liu, 656 F. Supp. 2d 407 (SDNY 2009); Red Baron-Franklin Park, Inc. v. Taito Corp., No. 88-0156-A, 1988 WL 167344, *3 (ED Va. 1988), rev’d on other grounds, 883 F. 2d 275 (CA4 1989).
For another thing, reliance upon the “first sale” doctrine is deeply embedded in the practices of those, such as booksellers, libraries, museums, and retailers, who have long relied upon its protection. Museums, for example, are not in the habit of asking their foreign counterparts to check with the heirs of copyright owners before sending, e. g., a Picasso on tour. Brief for Association of Art Museum Directors 11-12. That inertia means a dramatic change is likely necessary before these institutions, instructed by their counsel, would begin to engage in the complex permission-verifying process that a geographical interpretation would demand. And this Court’s adoption of the geographical interpretation could provide that dramatic change. These intolerable consequences (along with the absurd result that the copyright owner can exercise downstream control even when it authorized the import or first sale) have understandably led the Ninth Circuit, the Solicitor General as amicus, and the dissent to adopt textual readings of the statute that attempt to mitigate these harms. Brief for United States 27-28; post, *545 at 579-582. But those readings are not defensible, for they require too many unprecedented jumps over linguistic and other hurdles that in our view are insurmountable. See, e. g.,_ post, at 581 (acknowledging that its reading of § 106(3) “significantly curtails the independent effect of § 109(a)”).
Finally, the fact that harm has proved limited so far may simply reflect the reluctance of copyright holders so far to assert geographically based resale rights. They may decide differently if the law is clarified in their favor. Regardless, a copyright law that can work in practice only if unenforced is not a sound copyright law. It is a law that would create uncertainty, would bring about selective enforcement, and, if widely unenforced, would breed disrespect for copyright law itself.
Thus, we believe that the practical problems that petitioner and his amici have described are too serious, too extensive, and too likely to come about for us to dismiss them as insignificant—particularly in light of the ever-growing importance of foreign trade to America. See The World Bank, Imports of Goods and Services (% of GDP) (imports in 2011 18% of U. S. gross domestic product compared to 11% in 1980), online at http://data.worldbank.org/indicator/NE.IMP .GNFS.ZS? (as visited Mar. 15, 2013, and available in Clerk of Court’s case file). The upshot is that copyright-related consequences along with language, context, and interpretive canons argue strongly against a geographical interpretation of § 109(a).
Ill
Wiley and the dissent make several additional important arguments in favor of the geographical interpretation. First, they say that our Quality King decision strongly supports its geographical interpretation. In that case we asked whether the Act’s “importation provision,” now § 602(a)(1) (then § 602(a)), barred importation (without permission) of a copyrighted item (labels affixed to hair care products) where an American copyright owner authorized the first sale and *546 export of hair care products with copyrighted labels made in the United States, and where a buyer sought to import them back into the United States without the copyright owner’s permission. 523 U. S., at 138-139.
We held that the importation provision did not prohibit sending the products back into the United States (without the copyright owner’s permission). That section says:
“Importation into the United States, without the authority of the owner of copyright under this title, of copies or phonorecords of a work that have been acquired outside the United States is an infringement of the exclusive right to distribute copies or phonorecords under section 106.” 17 U. S. C. § 602(a)(1) (2006 ed., Supp. V) (emphasis added).
See also § 602(a) (1994 ed.).
We pointed out that this section makes importation an infringement of the “exclusive right to distribute . . . under 106.” We noted that § 109(a)’s “first sale” doctrine limits the scope of the § 106 exclusive distribution right. We took as given the fact that the products at issue had at least once been sold. And we held that consequently, importation of the copyrighted labels does not violate § 602(a)(1). 523 U. S., at 145.
In reaching this conclusion we endorsed Bobbs-Merrill and its statement that the copyright laws were not “intended to create a right which would permit the holder of the copyright to fasten, by notice in a book ... a restriction upon the subsequent alienation of the subject-matter of copyright after the owner had parted with the title to one who had acquired full dominion over it.” 210 U. S., at 349-350.
We also explained why we rejected the claim that our interpretation would make § 602(a)(1) pointless. Those advancing that claim had pointed out that the 1976 Copyright Act amendments retained a prior antipiracy provision, prohibiting the importation of pirated copies. Quality King, supra, at 146. Thus, they said, § 602(a)(1) must prohibit the *547 importation of lawfully made copies, for to allow the importation of those lawfully made copies after a first sale, as Quality King’s, holding would do, would leave § 602(a)(1) without much to prohibit. It would become superfluous, without any real work to do.
We do not believe that this argument is a strong one. Under Quality King’s interpretation, § 602(a)(1) would still forbid importing (without permission, and subject to the exceptions in § 602(a)(3)) copies lawfully made abroad, for example, where (1) a foreign publisher operating as the licensee of an American publisher prints copies of a book overseas but, prior to any authorized sale, seeks to send them to the United States; (2) a foreign printer or other manufacturer (if not the “owner” for purposes of § 109(a), e. g., before an authorized sale) sought to send copyrighted goods to the United States; (3) “a book publisher transports copies to a wholesaler” and the wholesaler (not yet the owner) sends them to the United States, see Copyright Law Revision, pt. 4, at 211 (giving this example); or (4) a foreign film distributor, having leased films for distribution, or any other licensee, consignee, or bailee sought to send them to the United States. See, e. g., 2 Nimmer on Copyright § 8.12[B] [l][a], at 8-159 (“Section 109(a) provides that the distribution right may be exercised solely with respect to the initial disposition of copies of a work, not to prevent or restrict the resale or other further transfer of possession of such copies”). These examples show that § 602(a)(1) retains significance. We concede it has less significance than the dissent believes appropriate, but the dissent also adopts a construction of §106(3) that “significantly curtails” §109(a)’s effect, post, at 581, and &o limits the scope of that provision to a similar, or even greater, degree.
In Quality King we rejected the “superfluous” argument for similar reasons. But, when rejecting it, we said that, where an author gives exclusive American distribution rights to an American publisher and exclusive British distri- *548 button rights to a British publisher, “presumably only those [copies] made by the publisher of the United States edition would be ‘lawfully made under this title’ within the meaning of § 109(a).” 523 U. S., at 148 (emphasis added). Wiley now argues that this phrase in the Quality King opinion means that books published abroad (under license) must fall outside the words “lawfully made under this title” and that we have consequently already given those words the geographical interpretation that it favors.
We cannot, however, give the Quality King statement the legal weight for which Wiley argues. The language “lawfully made under this title” was not at issue in Quality King-, the point before us now was not then fully argued; we did not canvass the considerations we have here set forth; we there said nothing to suggest that the example assumes a “first sale”; and we there hedged our statement with the word “presumably. ” Most importantly, the statement is pure dictum. It is dictum contained in a rebuttal to a counterargument. And it is unnecessary dictum even in that respect. Is the Court having once written dicta calling a tomato a vegetable bound to deny that it is a fruit forever after?
To the contrary, we have written that we are not necessarily bound by dicta should more complete argument demonstrate that the dicta is not correct. Central Va. Community College v. Katz, 546 U. S. 356, 363 (2006) (“[W]e are not bound to follow our dicta in a prior case in which the point now at issue was not fully debated”); Humphrey’s Executor v. United States, 295 U. S. 602, 627-628 (1935) (rejecting, under stare decisis, dicta, “which may be followed if sufficiently persuasive but which are not controlling”). And, given the bit part that our Quality King statement played in our Quality King decision, we believe the view of stare decisis set forth in these opinions applies to the matter now before us.
Second, Wiley and the dissent argue (to those who consider legislative history) that the Act’s legislative history supports their interpretation. But the historical events to *549 which it points took place more than a decade before the enactment of the Act and, at best, are inconclusive.
During the 1960⅛, representatives of book, record, and film industries, meeting with the Register of Copyrights to discuss copyright revision, complained about the difficulty of dividing international markets. Copyright Law Revision Discussion and Comments on Report of the Register of Copyrights on the General Revision of the U. S. Copyright Law, 88th Cong., 1st Sess., pt. 2, p. 212 (Comm. Print 1963) (English editions of “particular” books “fin[d]” their “way into this country”); id., at 213 (works “published] in a country where there is no copyright protection of any sort” are put into “the free stream of commerce” and “shipped to the United States”); ibid, (similar concern in respect to films).
The then-Register of Copyrights, Abraham Kaminstein, found these examples “very troubling].” Ibid. And the Copyright Office released a draft provision that it said “deals with the matter of the importation for distribution in the United States of foreign copies that were made under proper authority but that, if sold in the United States, would be sold in contravention of the rights of the copyright owner who holds the exclusive right to sell copies in the United States.” Id., pt. 4, at 203. That draft version, without reference to § 106, simply forbids unauthorized imports. It said:
“Importation into the United States of copies or records of a work for the purpose of distribution to the public shall, if such articles are imported without the authority of the owner of the exclusive right to distribute copies or records under this title, constitute an infringement of copyright actionable under section 35 [17 U. S. C. § 501].” Id., Preliminary Draft for Revised U. S. Copyright Law and Discussions and Comments, 88th Cong., 2d Sess., pt. 3, pp. 32-33 (Comm. Print 1964).
In discussing the draft, some of those present expressed concern about its effect on the “first sale” doctrine. For example, Irwin Karp, representing the Authors League of *550 America asked, “If a German jobber lawfully buys copies from a German publisher, are we not running into the problem of restricting his transfer of his lawfully obtained copies?” Id., pt. 4, at 211. The Copyright Office representative replied: “This could vary from one situation to another, I guess. I should guess, for example, that if a book publisher transports [i. e., does not sell] copies to a wholesaler [i. e., a nonowner], this is not yet the kind of transaction that exhausts the right to control disposition.” Ibid, (emphasis added).
The Office later withdrew the draft, replacing it with a draft, which, by explicitly referring to § 106, was similar to the provision that became law, now § 602(a)(1). The Office noted in a report that, under the new draft, importation of a copy (without permission) “would violate the exclusive rights of the U. S. copyright owner . . . where the copyright owner had authorized the making of copies in a foreign country for distribution only in that country.” Id., pt. 6, at 150.
Still, that part of the report says nothing about the “first sale” doctrine, about § 109(a), or about the five words, “lawfully made under this title.” And neither the report nor its accompanying 1960’s draft answers the question before us here. Cf. Quality King, 523 U. S., at 145 (without those five words, the import clause, via its reference to § 106, imports the “first sale” doctrine).
But to ascertain the best reading of § 109(a), rather than dissecting the remarks of industry representatives concerning § 602 at congressional meetings held 10 years before the statute was enacted, see post, at 568-571, we would give greater weight to the congressional Report accompanying § 109(a), written a decade later when Congress passed the new law. That Report says:
“Section 109(a) restates and confirms the principle that, where the copyright owner has transferred ownership of a particular copy or phonorecord of a work, the person to whom the copy or phonorecord is transferred *551 is entitled to dispose of it by sale, rental, or any other means. Under this principle, which has been established by the court decisions and ... the present law, the copyright owner’s exclusive right of public distribution would have no effect upon anyone who owns ‘a particular copy or phonorecord lawfully made under this title’ and who wishes to transfer it to someone else or to destroy it.
[[Image here]]
“To come within the scope of section 109(a), a copy or phonorecord must have been ‘lawfully made under this title,’ though not necessarily with the copyright owner’s authorization. For example, any resale of an illegally ‘pirated’ phonorecord would be an infringement but the disposition of a phonorecord legally made under the compulsory licensing provisions. of section 115 would not.” H. R. Rep. No. 94-1476, at 79 (emphasis added).
Accord, S. Rep. No. 94-473, pp. 71-72 (1975).
This history reiterates the importance of the “first sale” doctrine. See, e. g., Copyright Law Revision, 1964 Revision Bill with Discussions and Comments, 89th Cong., 1st Sess., pt. 5, p. 66 (Comm. Print 1965) (“[F]ull ownership of a lawfully-made copy authorizes its owner to dispose of it freely”). It explains, as we have explained, the nongeo-graphical purposes of the words “lawfully made under this title.” Part II-B, supra. And it says nothing about geography. Nor, importantly, did §109(a)’s predecessor provision. See supra, at 534. This means that, contrary to the dissent’s suggestion, any lack of legislative history pertaining to the “first salé” doctrine only tends to bolster our position that Congress’ 1976 revision did not intend to create a drastic geographical change in its revision to that provision. See post, at 573, n. 13. We consequently believe that the legislative history, on balance, supports the nongeographi-eal interpretation.
*552 Third, Wiley and the dissent claim that a nongeographical interpretation will make it difficult, perhaps impossible, for publishers (and other copyright holders) to divide foreign and domestic markets. We concede that is so. A publisher may find it more difficult to charge different prices for the same book in different geographic markets. But we do not see how these facts help Wiley, for we can find no basic principle of copyright law that suggests that publishers are especially entitled to such rights.
The Constitution describes the nature of American copyright law by providing Congress with the power to “secur[ej” to “[ajuthors” “for limited [tjimes” the “exclusive [rjight to their . . . [wjritings.” Art. I, §8, cl. 8. The Founders, too, discussed the need to grant an author a limited right to exclude competition. Compare Letter from Thomas Jefferson to James Madison (July 31, 1788), in 13 Papers of Thomas Jefferson 440, 442-443 (J. Boyd ed. 1956) (arguing against any monopoly), with Letter from James Madison to Thomas Jefferson (Oct. 17,1788), in 14 id., at 16, 21 (J. Boyd ed. 1958) (arguing for a limited monopoly to secure production). But the Constitution’s language nowhere suggests that its limited exclusive right should include a right to divide markets or a concomitant right to charge different purchasers different prices for the same book, say, to increase or to maximize gain. Neither, to our knowledge, did any Founder make any such suggestion. We have found no precedent suggesting a legal preference for interpretations of copyright statutes that would provide for market divisions. Cf. Copyright Law Revision, pt. 2, at 194 (statement of Barbara Ringer, Copyright Office) (division of territorial markets was “primarily a matter of private contract”).
To the contrary, Congress enacted a copyright law that (through the “first sale” doctrine) limits copyright holders’ ability to divide domestic markets. And that limitation is consistent with antitrust laws that ordinarily forbid market *553 divisions. Cf. Palmer v. BRG of Ga., Inc., 498 U. S. 46, 49 (1990) (per curiam) (“[Ajgreements between competitors to allocate territories to minimize competition are illegal”). Whether copyright owners should, or should not, have more than ordinary commercial power to divide international markets is a matter for Congress to decide. We do no more here than try to determine what decision Congress has taken.
Fourth, the dissent and Wiley contend that our decision launches United States copyright law into an unprecedented regime of “international exhaustion. ” Post, at 573-578; Brief for Respondent 45-46. But they point to nothing indicative of congressional intent in 1976. The dissent also claims that it is clear that the United States now opposes adopting such a regime, but the Solicitor General as amicus has taken no such position in this case. In fact, when pressed at oral argument, the Solicitor General stated that the consequences of Wiley’s reading of the statute (perpetual downstream control) were “worse” than those of Kirtsaeng’s reading (restriction of market segmentation). Tr. of Oral Arg. 51. And the dissent’s reliance on the Solicitor General’s position in Quality King is undermined by his agreement in that case with our reading of § 109(a). Brief for United States as Amicus Curiae in Quality King, O. T. 1996, No. 1470, p. 30 (“When . . . Congress wishes to make the location of manufacture relevant to Copyright Act protection, it does so expressly”); ibid, (calling it “distinctly unlikely” that Congress would have provided an incentive for overseas manufacturing).
Moreover, the exhaustion regime the dissent apparently favors would provide that “the sale in one country of a good” does not “exhaus[t] the intellectual property owner’s right to control the distribution of that good elsewhere.” Post, at 574. But our holding in Quality King that § 109(a) is a defense in U. S. courts even when “the first sale occurred abroad,” 523 U. S., at 145, n. 14, has already significantly eroded such a principle.
*554 > 1—I
For these reasons we conclude that the considerations supporting Kirtsaeng’s nongeographical interpretation of the words “lawfully made under this title” are the more persuasive. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.