# Syllabus

Chief Justice:
Bridget M. McCormack

Chief Justice Pro Tem:
David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

HONIGMAN MILLER SCHWARTZ AND COHN LLP v CITY OF DETROIT

Docket No. 157522. Argued October 2, 2019 (Calendar No. 2). Decided May 18, 2020.

Honigman Miller Schwartz and Cohn LLP filed a petition in the Tax Tribunal, challenging the income tax assessments issued by the city of Detroit for the tax years 2010 through 2014. Petitioner argued that under MCL 141.623 of the Uniform City Income Tax Ordinance (UCITO), MCL 141.601 *et seq.*, payment for services performed by attorneys working in the city on behalf of clients located outside the city constituted out-of-city revenue for the purpose of calculating income taxes, not in-city revenue as asserted by respondent. In other words, petitioner argued that MCL 141.623 encompassed only revenue derived from services delivered to clients located within the city, and respondent argued that the figure calculated under MCL 141.623 should have included revenue for all services performed within the city without regard to either the client's location or the place of delivery. The tribunal granted partial summary disposition in favor of respondent, reasoning that the relevant consideration for calculating gross revenue under MCL 141.623 was where the work was performed, not where the client received the services. The Court of Appeals, MURPHY, P.J., and SAWYER and BECKERING, JJ., reversed the tribunal, concluding that under MCL 141.623, the relevant consideration for determining the percentage of gross revenue from services rendered in the city was where the service itself was delivered to the client, not where the attorney performed the service; in reaching that result, the Court attributed different meanings to the term "rendered" in MCL 141.623 and the term "performed" in MCL 141.622, reasoning that because the Legislature used different words within the same act, it intended the terms to have distinct meanings. 322 Mich App 667 (2018). The Supreme Court granted respondent's application for leave to appeal. 503 Mich 909 (2018).

In an opinion by Justice MARKMAN, joined by Justices ZAHRA, BERNSTEIN, and CAVANAGH, the Supreme Court *held*:

The term "rendered" in MCL 141.623 means to do a service for another. In employing that term, the Legislature adopted an origin test, rather than a market-based approach for calculating revenue from services under MCL 141.623. When determining the percentage of gross revenue from services rendered in the city under MCL 141.623, that figure encompasses all legal services performed within the city regardless of where those services are delivered. Thus, when calculating the percentage of gross revenue from services rendered in the city, the focus is on where the service was performed, not on where it was delivered.

1. For purposes of interpreting the UCITO, it is useful to consider the analogous context of the sale of services in multistate-business taxation. Historically, business taxation laws in Michigan implemented an origin test by assigning services to the state in which they were performed. Because of the growth of the economy's service sector, this treatment has evolved in Michigan toward market-based sourcing rules for services and other intangibles; in that regard, the Michigan Business Tax Act, 2007 PA 36, and the corporate income tax act, 2011 PA 38, required that the sale of services and other intangibles be calculated on the basis of where the recipient received the benefit, either in state or out of state.

2. MCL 141.618 of the UCITO requires a business to determine the percentage of its net profit that is derived from business activities within the city. To arrive at that number, MCL 141.624 requires a business to calculate taxable net profit from business activity within a city— the business allocation percentage—by calculating the property factor under MCL 141.621, the payroll factor under MCL 141.622, and the revenue factor under MCL 141.623, after which the figures are added together and divided by three. In calculating the payroll factor, MCL 141.622 requires that the taxpayer ascertain the percentage which the total compensation paid to employees for work done or for services *performed* within the city is of the total compensation paid to all the taxpayer's employees within and without the city during the period covered by the return. In calculating the revenue factor, MCL 141.623 requires the taxpayer to ascertain the percentage which the gross revenue of the taxpayer derived from sales made and services *rendered* in the city is of the total gross revenue from sales and services wherever made or rendered during the period covered by the return. With regard to MCL 141.623(1), the phrase "sales made in the city" means all sales where the goods, merchandise, or property is received in the city by the purchaser, or a person or firm designated by the purchaser. Thus, with respect to the delivery of goods in the city, the place at which the delivery has been completed is considered as the place at which the goods are received by the purchaser, and the Legislature provides examples illustrating when revenue from the delivery of goods is considered in-city or out-of-city; the provision is therefore a market-based sourcing rule that focuses on where the goods were delivered. In contrast, the Legislature adopted an origin test for "services rendered" under the revenue factor. Given the dictionary definition of the term "render"—that is, to do a service for another—the revenue factor focuses on where the services are done or carried out, not on where the services are delivered. Had the Legislature intended to treat services similarly to the sale of goods, it would have plainly expressed that intention and could have seen fit to also provide guidance illustrating how services are "delivered" and when the delivery of services should be considered in-city or out-of-city. Moreover, because the phrase "services rendered in the city," and slight variations of that phrase appear in many provisions of the UCITO, it is clear when apportioning a business's net profits that the focus is on where the profit-earning activity takes place. Reading the revenue factor in context alongside the payroll and property factors, as well as with the UCITO's broader provisions that employ the phrase "services rendered," the apportionment of gross revenue under the revenue factor must be determined on the basis of the location at which the business activity, including legal services, takes place. Thus, "services rendered" under the revenue factor encompasses revenue for all services done or carried out within the city, even when those services are performed for out-of-city clients.

3. When the Legislature uses different words, they generally intend those words to have different meanings. This maxim of jurisprudence is a general rule and may not apply in every situation, particularly when its use would not give meaning to the entire statutory scheme or the

overall context of provisions within the statutory scheme; therefore, competing rules of interpretation must be balanced and harmonized to fully discern what the Legislature intended. With regard to the UCITO, although the Legislature used the term "performed" in MCL 141.622 and the term "rendered" in MCL 141.623, the terms have similar meanings within those provisions. In that regard, "performed" in MCL 141.622 means "to carry out," which connotes a similar meaning to "rendered" in MCL 141.623, meaning, in context, "to do a service for another." As a result, the Legislature intended both revenue for "services *rendered* in the city" and compensation for "services *performed* within the city" to be calculated similarly—specifically on the basis of where the service has been done or carried out. However, the terms do not have identical meanings; they are similarly defined, but each has a distinctive connotation given its distinctive context and placement within the act. Specifically, within the UCITO, the term "performed" relates to an employee's compensation for services carried out for an employer, while the term "rendered" relates to earnings, such as net profits, derived from services done on behalf of clients. Thus, MCL 141.622 connects the employee's performance of services to his or her compensation from the employer, while MCL 141.623 connects the taxpayer's revenue to the process by which the business or firm provides services for others, in particular, to its clients. Although the terms are distinct, the Legislature intended them to have an essentially common meaning and to focus the UCITO's analysis on where a service has been done or carried out and not on where it was finally delivered. The contextual distinction explains why the Legislature employed different terms to describe how to calculate which services are taxable, as well as why the terms are not interchangeable throughout the act.

4. Accordingly, although the terms "rendered" and "performed" generally have similar meanings and are effectively equivalent in their relative purposes within the act, the consistent-usage canon did not apply in this case because the distinctive contexts in which the terms appear account for the Legislature's use of different words despite their similar meanings. The Court of Appeals erred by determining that under MCL 141.623, revenue for services rendered in the city is calculated on the basis of where the services were delivered instead of where the services were performed; instead, the tribunal correctly concluded that petitioner must calculate gross revenue under MCL 141.623 on the basis of where the services are performed, not on where the client that received those services was located.

Court of Appeals judgment reversed and the case remanded to the tribunal for further proceedings.

Justice VIVIANO, joined by Chief Justice MCCORMACK and Justice CLEMENT, concurring, agreed with the result reached by the majority but wrote separately to express his disagreement with the majority's analysis in Part III(D) of the opinion in which it sought to differentiate between the term "render" in MCL 141.623 and the term "perform" in MCL 141.622. The issue in this case was whether the phrase "services rendered" in MCL 141.623 includes work "performed" in the city of Detroit for clients outside the city even though MCL 141.622 contains the phrase "services performed." Before the majority's discussion in Part III(D) of the terms' supposed distinctive connotations, the majority's textual, contextual, and historical bases for its interpretations plainly indicate that "services rendered" means "services performed." This portion of the opinion was sufficient to determine that "rendered" refers to the place the service was performed, not where it was delivered, and the majority should not have attempted to distinguish between those two terms in Part III(D) just to avoid the presumption of consistent usage. The

majority's analysis, which created a new exception to the consistent-usage presumption, was unpersuasive. Provisions of the UCITO contradict the majority's contention that "performed" is consistently used—in contradistinction to "rendered"—in referring to compensation for services performed by an employee. In addition, the majority failed to explain how its distinction illuminated the semantic content of the terms; because the majority did not mention the connotations it discussed in Part III(D) of the opinion in the critical parts of the opinion defining the terms, the contextual analysis is not part of those meanings when considering the presumption of consistent usage and deciding whether the definitions are the same for purposes of that canon. Moreover, the majority's contextual analysis in that part of the opinion left the terms semantically unchanged; thus, it failed to demonstrate that the different terms have different meanings, making the canon inapplicable. The majority's analysis assumed that if different terms occur in different contexts, albeit in close proximity in the same act, there is no general presumption against giving them the same meaning. That is not how the canon works. Instead, the canon itself provided the answer in this case because it is simply a presumption that has long been recognized as an imperfect tool for determining textual meaning. Drafters often use different words to denote the same concept. The presumption thus readily yields when a fair reading of the text requires. The majority's analysis in Part III(D) did not demonstrate that the terms are semantically distinct; rather, that portion of the opinion simply demonstrated, if anything, that the Legislature may have employed the different terms for stylistic variety. Justice VIVIANO would have concluded that the meaning of the term "rendered" in MCL 141.623 clearly meant "performed" and that the common-usage canon gave way to textual and contextual evidence.

©2020 State of Michigan

# OPINION

Chief Justice:
Bridget M. McCormack

Chief Justice Pro Tem:
David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

FILED May 18, 2020

STATE OF MICHIGAN

SUPREME COURT

HONIGMAN MILLER SCHWARTZ AND
COHN LLP,

Petitioner-Appellee,

v                                                                                              No. 157522

CITY OF DETROIT,

Respondent-Appellant.

BEFORE THE ENTIRE BENCH

MARKMAN, J.

The issue here is whether the phrase "services rendered in the city" in MCL 141.623 of the Uniform City Income Tax Ordinance (UCITO), MCL 141.601 *et seq*., encompasses legal services performed within the city-- in this case, the city of Detroit-- but delivered to clients situated outside the city.[1] The Michigan Tax Tribunal (the Tribunal) concluded that

---

[1] The UCITO is contained within Chapter 2 of the City Income Tax Act, MCL 141.501 *et seq*. 1964 PA 284.

under § 23 of the UCITO, MCL 141.623, "services rendered in the city" encompasses all legal services *performed* within the city regardless of where those services are delivered. However, the Court of Appeals reversed the Tribunal and concluded that the pertinent consideration under § 23 is where the services are *delivered* to the client. On application, this Court now resolves this disagreement by identifying what we view as the proper understanding of § 23. Needless to say, nothing herein should be understood as communicating our perspectives concerning the wisdom, the merits, or the prudence of this provision. Because we conclude that § 23 encompasses all legal services performed, i.e., done or carried out within the city without regard to where those services are delivered, we reverse the judgment of the Court of Appeals and remand to the Tribunal for entry of an order granting partial summary disposition in favor of respondent, the city of Detroit.

## I. FACTS & HISTORY

Petitioner, Honigman Miller Schwartz and Cohn LLP (Honigman), is a law firm that operates offices within and outside Detroit.[2] Each year, Honigman, as an unincorporated business whose "entire net profit . . . is not derived from business activities exclusively within the city," MCL 141.618, apportions its net profit using a three-factor formula known as the "business allocation percentage method," MCL 141.620. This formula incorporates a "property factor," the numerator of which includes the value of tangible personal and real property "situated within the city," MCL 141.621; a "payroll factor," the numerator of which includes total compensation paid to employees for "services performed within the city," MCL 141.622; and a "revenue factor," the numerator

---

[2] Honigman changed its name, effective January 1, 2019, to Honigman LLP.

of which includes revenue derived from "services rendered in the city," MCL 141.623. From 2010 through 2014, Honigman calculated its revenue factor for services rendered in the city as approximately 11% of its gross revenue, excluding from this calculation revenues that resulted from services-- e.g., legal research, document creation and preparation, and the arguing of motions-- performed within the city but "delivered" to clients outside the city. However, the city determined that the proper amount under the revenue factor should have been calculated at approximately 50% of Honigman's gross revenues, taking more fully into account revenue for services performed within Detroit on behalf of out-of-city clients. The city thus imposed an additional tax assessment of approximately $1.1 million dollars, which became final in 2016.

Honigman subsequently filed a petition in the Tribunal, and both parties sought partial summary disposition under MCR 2.116(C)(10). The Tribunal granted the city's motion and denied Honigman's motion, concluding that § 23 is "ambiguous" and that the better interpretation of "services rendered in the city" requires that the revenue factor be determined using revenues generated where the services are performed and not where they are delivered.[3] The Tribunal discussed why the statute would employ the term "performed" under one provision of the UCITO and "rendered" under another, stating:

---

[3] We note the confusing nature of this aspect of the Tribunal's ruling. It is well settled that "ambiguities in the language of a tax statute are to be resolved in favor of the taxpayer." *Mich Bell Tel Co v Dep't of Treasury*, 445 Mich 470, 477; 518 NW2d 808 (1994); cf. *Denton v Dep't of Treasury*, 317 Mich App 303, 310; 894 NW2d 694 (2016) (stating, however, that tax *exemptions* are to be "strictly construed" against the taxpayer). The Tribunal here concluded that the statute was "ambiguous" but nonetheless resolved this dispute in favor of the city. We believe the Tribunal erred by characterizing § 23 as "ambiguous," but that it did not err in its understanding of § 23.

3

Reading [the UCITO] in context, the Tribunal finds that the difference reflects nothing more than the syntax of the English language. The term "performed" is used in MCL 141.622 because that section pertains to compensation paid to employees, and services are typically "performed" for an employer, while in terms of generating revenue, they are "rendered" to a client. Further, the definitions and comparisons offered by [Honigman] are not on point. [Honigman] cites definitions provided by Black's Law Dictionary and Merriam-Webster Online Dictionary that imply an act of delivery, e.g., "to transmit or deliver" and "to give." [Honigman] notes that these definitions align with the concept of "goods received," which focuses on where goods are destined. As noted by [the city], however, [Honigman's] legal professionals sell their services-- they do not generate "gross revenue" from "sales." And unlike goods, merchandise, and property, services are intangible, and they cannot be "delivered" in the same manner as tangible items. [The city] aptly notes that "A lawyer's time and advice is his stock in trade." It does not logically follow, therefore, that the determination of where services are rendered must also be based on where the recipient of the services is located. In addition to the definition provided by [Honigman], the Merriam-Webster Online Dictionary also defines the term "render" as "to do (a service) for another." In turn, the term "do" is defined as "perform, execute." As such, the Tribunal finds that the term is synonymous with perform.

The parties reached agreement regarding the remaining issues, and a final appealable order was entered.

Honigman subsequently argued in the Court of Appeals that the two terms bear distinctive meanings-- that § 23 is not "ambiguous" because it focuses on the delivery of services and that, even if it *was* ambiguous, it should be construed in Honigman's favor as the taxpayer. The Court began its analysis by addressing the statute's use of the terms "performed" and "rendered":

We begin by observing that the Legislature used two different terms in drafting the payroll factor under § 22 and the sales factor under § 23. The payroll factor refers to "services performed," and § 23 refers to "services rendered." We agree with [Honigman] that these phrases must be given two different meanings because when

4

the Legislature uses different words, the words are generally intended to connote different meanings. Simply put, "the use of different terms within similar statutes generally implies that different meanings were intended." If the Legislature had intended the same meaning in both statutory provisions, it would have used the same word." Therefore, because § 22 refers to where the work is done or performed, the Legislature likely intended that the § 23 phrase "services rendered" have a different meaning.

[*Honigman Miller Schwartz and Cohn LLP v Detroit*, 322 Mich App 667, 671-672; 915 NW2d 383 (2018) (citation omitted).]

The Court also adopted Honigman's proposed definition of "render":

[T]he relevant definition of "render" is "to transmit to another: DELIVER." This is in contrast to the Tribunal's opinion, which looked to an online definition of "render": " 'to do (a service) for another.' "[4] The [Tribunal's] opinion then equated "do" with "perform" to reach the conclusion that "render" is "synonymous with perform." We find this conclusion to be dubious and unnecessarily convoluted. Why would the Legislature use the word "render" to mean "perform" by way of the verb "to do," when it would have been much simpler and clearer to simply reuse the § 22 word "perform"? This neatly illustrates the principle that the Legislature employs different words when it intends different meanings. [*Id*. at 674.]

Concluding that "the relevant consideration in § 23 is where the service is delivered to the client, not where the attorney performs the service," the Court of Appeals reversed the Tribunal and remanded for further proceedings. *Id*. This Court then ordered and heard oral argument concerning whether the Court of Appeals erred in its interpretation of the phrase "services rendered in the city." *Honigman Miller Schwartz and Cohn LLP v Detroit*, 503 Mich 909 (2018).

---

[4] The Tribunal's definition of "render" is found in *Merriam-Webster's Collegiate Dictionary* (11th ed), and it is therefore not just an "online definition." Rather, the definitions of "render" relied on by both the Tribunal and Court of Appeals can be found in this dictionary, and these definitions have not changed since the statute's enactment in 1964. See *Webster's Seventh New Collegiate Dictionary* (7th ed).

## II. STANDARD OF REVIEW

"If the facts are not disputed and fraud is not alleged, our review is limited to whether the Tax Tribunal made an error of law or adopted a wrong principle." *Mich Props, LLC v Meridian Twp*, 491 Mich 518, 527-528; 817 NW2d 548 (2012). We review de novo a decision on a motion for summary disposition under MCR 2.116(C)(10). *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). Moreover, this case presents a significant question of statutory interpretation, which is also reviewed de novo. *Mich Props, LLC*, 491 Mich at 528. Accordingly, we are required to examine the provisions of the UCITO. See *Danse Corp v Madison Hts*, 466 Mich 175, 181-182; 644 NW2d 721 (2002). "Where the statutory language is unambiguous, the plain meaning reflects the Legislature's intent and the statute must be applied as written." *Id*. at 182, citing *Tryc v Mich Veterans' Facility*, 451 Mich 129, 135; 545 NW2d 642 (1996). Each word and phrase in a statute "must be assigned such meanings as are in harmony with the whole of the statute, construed in light of history and common sense." *Sweatt v Dep't of Corrections*, 468 Mich 172, 179; 661 NW2d 201 (2003) (opinion by MARKMAN, J.) (quotation marks and citation omitted). "An administrative agency's interpretation of a statute that it is obligated to execute is entitled to 'respectful consideration,' but it cannot 'conflict with the plain meaning of the statute.' " *Hegadorn v Dep't of Human Servs Dir*, 503 Mich 231, 244; 931 NW2d 571 (2019), quoting *In re Rovas Complaint Against SBC Mich*, 482 Mich 90, 108; 754 NW2d 259 (2008).

6

## III. ANALYSIS

### A. UNIFORM CITY INCOME TAX ORDINANCE

This dispute involves the proper interpretation of the UCITO, which has been adopted by Detroit under Detroit Ordinances, § 18-10-1 *et seq.*[5] The provisions of the UCITO, including MCL 141.618, establish the framework within which Honigman must apportion its net profit.

Section 18 addresses the taxation of a business's "net profit" for business activities that are not "exclusively" conducted within the city:

> When the entire net profit of a business subject to the tax is not derived from business activities exclusively within the city, the portion of the entire net profit, earned as a result of work done, services rendered or other business activity conducted in the city, shall be determined under either [MCL 141.619], [MCL 141.620 to MCL 141.624], or [MCL 141.625]. [MCL 141.618.]

There is no dispute that Honigman's city taxes are determined under MCL 141.620 to MCL 141.624. Those provisions set forth the three-factor formula, known as the "business allocation percentage method," for calculating the taxable "net profit of a business."

Section 20 introduces the three-factor formula as follows:

> The business allocation percentage method shall be used if such taxpayer is not granted approval to use the separate accounting method of allocation. The entire net profits of such taxpayer earned as a result of work done, services rendered or other business activity conducted in the city shall be ascertained by determining the total "in-city" percentages of property, payroll and sales. "In-city" percentages of property, payrolls and sales,

---

[5] Detroit adopted the UCITO by way of its authority as a home-rule city. See Detroit Charter, art 1, § 1-101. We recognize that Detroit has incorporated these tax provisions into its code of ordinances, but for ease of reference, we refer only to the identical provisions under MCL 141.601 *et seq*.

7

separately computed, shall be determined in accordance with [MCL 141.621 to MCL 141.624]. [MCL 141.620.]

This formula thus identifies three discrete factors-- the property factor, the payroll factor, and the revenue factor-- that must each be ascertained and then averaged to arrive at the "business allocation percentage." MCL 141.621 to MCL 141.624.

The first of these, the property factor, states, in relevant part:

> First, the taxpayer shall ascertain the percentage which the average net book value, of the tangible personal property owned and the real property, including leasehold improvements, owned or used by it in the business and situated within the city during the taxable period, is of the average net book value of all of such property, including leasehold improvements, owned or used by the taxpayer in the business during the same period wherever situated. [MCL 141.621.]

The payroll factor next states:

> Second, the taxpayer shall ascertain the percentage which the total compensation paid to employees for work done or for *services performed within the city* is of the total compensation paid to all the taxpayer's employees within and without the city during the period covered by the return. For allocation purposes, compensation shall be computed on the cash or accrual basis in accordance with the method used in computing the entire net income of the taxpayer.[6]

> If an employee performs services within and without the city, the following examples are not all inclusive but may serve as a guide for determining the amount to be treated as compensation for services performed within the city:

> (a) In the case of an employee compensated on a time basis, the proportion of the total amount received by him which his working time within the city is of his total working time.

---

[6] "Compensation" is defined as "salary, pay or emolument given as compensation or wages for work done or services rendered, in cash or in kind, and includes but is not limited to the following: salaries, wages, bonuses, commissions, fees, tips, incentive payments, severance pay, vacation pay and sick pay." MCL 141.604(2).

(b) In the case of an employee compensated directly on the volume of business secured by him, such as a salesman on a commission basis, the amount received by him for business attributable to his efforts in the city.

(c) In the case of an employee compensated on other results achieved, the proportion of the total compensation received which the value of his services within the city bears to the value of all his services. [MCL 141.622 (emphasis added).]

Finally, the revenue factor states, in relevant part:

Third, the taxpayer shall ascertain the percentage which the gross revenue of the taxpayer derived from sales made and *services rendered in the city* is of the total gross revenue from sales and services wherever made or rendered during the period covered by the return. [MCL 141.623 (emphasis added).]

Concerning "sales made in the city," the revenue factor affords further guidance for calculating revenues involving the delivery of goods:

(1) For the purposes of this section, "sales made in the city" means all sales where the goods, merchandise or property is received in the city by the purchaser, or a person or firm designated by him. In the case of delivery of goods in the city to a common or private carrier or by other means of transportation, the place at which the delivery has been completed is considered as the place at which the goods are received by the purchaser.

The following examples are not all inclusive but may serve as a guide for determining sales made in the city:

(a) Sales to a customer in the city with shipments to a destination within the city from a location in the city or an out-of-city location are considered sales made in the city.

(b) Sales to a customer in the city with shipments to a destination within the city directly from the taxpayer's in-city supplier or out-of-city supplier are considered sales made in the city.

(c) Sales to a customer in the city with shipments directly to the customer at his regularly maintained and established out-of-city location are considered out-of-city sales.

(d) Sales to an out-of-city customer with shipments or deliveries to the customer's location within the city are considered sales made in the city.

(e) Sales to an out-of-city customer with shipments to an out-of-city destination are considered out-of-city sales. [MCL 141.623(1).]

The parties agree on the method of calculation for the property and payroll factors, but they dispute how to calculate the percentage of revenue from "services rendered in the city" under the revenue factor.[7] From 2010 to 2014, Honigman calculated the numerator of the revenue factor under § 23 as encompassing only revenue derived from services delivered to clients located within Detroit, but the city asserts that Honigman should have included within this numerator revenue for all services performed within Detroit without regard to either the client's location or the place of delivery. Before we interpret the pertinent statute to ascertain how Honigman must calculate revenue from "services rendered" under the revenue factor, there is value in briefly reviewing the history of our state's tax treatment of revenue from the sale of services.

## B. SALE OF SERVICES

In an analogous context of our state's business taxation laws, "the Legislature has always required a multistate taxpayer with business income or activity both within and without the state to apportion its tax base." *Int'l Business Machines Corp v Dep't of Treasury*, 496 Mich 642, 650; 852 NW2d 865 (2014) (*IBM Corp*) (opinion by

---

[7] For purposes of the UCITO, we conclude that "performed" under the payroll factor means "to carry out an action . . . ," *Merriam-Webster's Collegiate Dictionary* (11th ed), and accordingly, as the parties do not dispute, that compensation for "services performed within the city" is calculated on the basis of the location at which the employee has carried out the service for compensation.

VIVIANO, J.).[8]  As with the UCITO, which was adopted in 1964, our early business-income tax laws did not provide a detailed explanation of how receipts from the sale of services should be apportioned.[9]  At least by 1955, however, when the Legislature first adopted a multifactor apportionment formula, it was clear that our state followed "the traditional rule of assigning services to the state in which they are performed."[10]  See MCL 205.553(b)(1)(C)(2) and (3), as amended by 1955 PA 282 (apportioning receipts from services by dividing the taxpayer's gross receipts from "[s]ervices performed within this state" by the total amount of the taxpayer's gross receipts from "services performed . . . both within and without the state").[11]

---

[8] Although our business taxation laws concern the apportionment of income between Michigan and other states, reviewing their apportionment provisions is useful because these show the historical development of formula-based apportionment rules for receipts from services in Michigan and offer insight as to the apportionment of in-city and out-of-city income under the UCITO.

[9] See MCL 205.553(2), as adopted in 1953 PA 150; MCL 205.553(b)(1), as amended by 1954 PA 17; and MCL 205.553(b)(1)(C), as amended by 1955 PA 282.  The last of these acts is noteworthy because it appears to be the first time the Legislature adopted a multifactor formula to determine the adjusted receipts of a taxpayer to be deemed attributable to Michigan.  See MCL 205.553(b), as amended by 1955 PA 282.

[10] See 1 Hellerstein, Hellerstein & Swain, State Taxation (3d ed), ¶ 9.18[3][a], p 9-372.  See also 1964 HR Rep No 1480, p 188 ("Among those States which provide specific rules for the assignment of particular types of receipts, other than those from the sale of tangible personalty, there is considerable uniformity in their attribution provisions.  Receipts from services are assigned to the State where the service is performed.").

[11] Because these were enacted in an era when significantly fewer services were remotely consumed (see *infra* note 16 and accompanying text), the prior versions of the statute likely would have been viewed the same way even though these employed the phrase at issue here, "services rendered."  See MCL 205.553(2), as adopted in 1953 PA 150 (apportioning receipts from "the rendition of services" by multiplying the total adjusted gross receipts "by a fraction the numerator of which is gross receipts from services rendered in Michigan

11

However, that changed in 1965 when the Legislature incorporated language from the Uniform Division of Income for Tax Purposes Act (UDITPA) into our income tax statute. MCL 205.553(c)(3)(b), as amended by 1965 PA 186, specified that revenue from the sale of services should be included in the sales factor if:

> (i) The income-producing activity is performed in this state; or

> (ii) The income-producing activity is performed both in and outside this state and a greater proportion of the income-producing activity is performed in this state than in any other state, based on costs of performance.[12]

---

and the denominator gross receipts from services rendered everywhere"); MCL 205.553(b)(1), as amended by 1954 PA 17 (same).

[12] This provision is almost identical to art IV, § 17 of the UDITPA. In the same public act, our Legislature adopted a destination test for the sale of tangible personal property by incorporating language from art IV, § 16 of the UDITPA into our income tax statute. See MCL 205.553(c)(3)(a), as amended by 1965 PA 186. Notably, during the debate over whether to adopt a destination or an origin test as the fundamental rule of attribution for sales of tangible personal property in the UDITPA,

> [w]hile acknowledging that an origin test would have been the preferred choice of the manufacturing states, the National Conference of Commissioners on Uniform State Laws "was of the opinion that [a sales factor with an origin test] would merely duplicate the property and payroll factors which emphasize the activity of the manufacturing state." [Hellerstein, *Construing the Uniform Division of Income for Tax Purposes Act: Reflections on the Illinois Supreme Court's Reading of the "Throwback" Rule*, 45 U Chi L Rev 768, 773-774 (1978) (second alteration in original).]

Furthermore, as Professor Hellerstein noted, "the adoption of the destination test [was] so widespread as to render academic any question of its acceptability." *Id*. at 774. But despite that criticism, the Uniform Law Commissioners adopted an origin test for the sale of services. See *id*. at 772 (noting that with respect to the sale of services, "UDITPA attributes receipts to the state in which 'the income-producing activity is performed' or, if it is performed in more than one state, to the state in which a 'greater proportion of the income-

The Legislature maintained this language when it repealed our initial income tax statute and replaced it with the Income Tax Act of 1967. See MCL 206.123, as adopted in 1967 PA 281.[13] And it employed similar language several years later in 1975 in adopting the Single Business Tax Act (SBTA).[14]

In recent years, a different trend-- toward "market-based sourcing" rules-- has emerged.[15] This trend has been fueled by the growth of the service sector of the economy

---

producing activity is performed . . . based on costs of performance' "). And our Legislature followed suit, incorporating this language into our income tax statute in 1965.

[13] Michigan formally adopted the UDITPA and joined the Multistate Tax Compact in 1969. See 1969 PA 343. The Legislature later reversed course after this Court's decision in *IBM Corp*, 496 Mich 642. See 2014 PA 282.

[14] See MCL 208.53, as adopted by 1975 PA 228:

> Sales, other than sales of tangible personal property, are in this state if:
>
> (a) The business activity is performed in this state.
>
> (b) The business activity is performed both in and outside this state and, based on costs of performance, a greater proportion of the business activity is performed in this state than is performed outside this state.
>
> (c) Receipts derived from services performed for planning, design, or construction activities within this state shall be deemed Michigan receipts.

[15] See Schadewald, *Apportioning Income from Sales of Services: The Rules Have Changed*, The CPA J (Oct 2016), available at <https://www.cpajournal.com/2016/10/01/apportioning-income-from-sales-of-services/> (accessed March 18, 2020) ("In 2000, only a handful of states . . . used market-based sourcing rules for sales of services," but "[i]n recent years, many states have replaced the cost of performance rule with market-based sourcing rules for sales of services."). See also Hellerstein, Hellerstein & Swain, ¶ 9.18[3], at 9-368 ("Before the widespread adoption of UDITPA and similar statutes that attributed sales of services based on a catch-all 'income-producing activity'/'cost of performance' test for attributing receipts from all sales other than sales of tangible personal property, and the more recent and equally widespread

and the development of new technologies that allow for more services to be provided remotely.[16] Michigan followed the trend toward market-based sourcing in 2007 when our Legislature adopted the Michigan Business Tax Act (MBTA), 2007 PA 36, shortly after repealing the SBTA. See 2006 PA 325. Under the MBTA's approach, revenue from the sale of services is attributed to the specific market in which the benefit of the services is received.[17] And the Legislature preserved this language in adopting a new corporate

_____

replacement of the UDITPA approach with a 'market-state' approach to attribution of receipts from the sale of services, states typically included receipts from services in the numerator of the receipts factor to the extent that the services were performed in the state.") (citations omitted).

[16] In an influential article pointing out the weaknesses in UDITPA's treatment of services, Professor Swain explained that "when UDITPA was first promulgated in 1957, it was much more reasonable to assume that customer location would correlate with the place of the performance. Thus, place of performance may have been an acceptable proxy for the market state." Swain, *Reforming the State Corporate Income Tax: A Market State Approach to the Sourcing of Service Receipts*, 83 Tul L Rev 285, 300 (2008). However, in light of the growth of remotely consumed services, this was no longer the case:

> A product of its day, UDITPA was written against the backdrop of an economy dominated by mercantile and manufacturing enterprises . . . . The U.S. economy, however, has changed dramatically since that time. Production has shifted steadily from goods to services and intangibles, and the forces of globalization, spurred by the revolution in communications technology, now allow many more goods and services to be supplied remotely. This puts tremendous pressure on division of income rules that were developed in another era. [*Id.* at 287.]

[17] Under MCL 208.1305(2):

> Sales from the performance of services are in this state and attributable to this state as follows:
>
> (a) Except as otherwise provided in this section, all receipts from the performance of services are included in the numerator of the apportionment factor if the recipient of the services receives all of the benefit of the services in this state. If the recipient of the services receives some of the benefit of

14

income tax in 2011. See MCL 206.665(2)(a), as adopted in 2011 PA 38.[18] Although the

UDITPA has not been amended, in 2015, the Multistate Tax Commission revised Article

IV of the Multistate Tax Compact to encompass market-based sourcing for the sale of

services and other intangibles.[19] In other words, the language of each of these provisions

---

the services in this state, the receipts are included in the numerator of the apportionment factor in proportion to the extent that the recipient receives benefit of the services in this state.

[18] Under MCL 206.665(2):

Sales from the performance of services are in this state and attributable to this state as follows:

(a) Except as otherwise provided in this section, all receipts from the performance of services are included in the numerator of the apportionment factor if the recipient of the services receives all of the benefit of the services in this state. If the recipient of the services receives some of the benefit of the services in this state, the receipts are included in the numerator of the apportionment factor in proportion to the extent that the recipient receives benefit of the services in this state.

[19] See Model Multistate Tax Compact (as revised by the Multistate Tax Commission, July 29, 2015), art 4, § 17 ("Receipts, other than receipts described in Section 16, are in this State if the taxpayer's market for the sales is in this state. The taxpayer's market for sales is in this state: . . . (3) in the case of sale of a service, if and to the extent the service is delivered to a location in this state[.]") (paragraph structure omitted). Changing to market-based sourcing for the sale of services and other intangibles was intended to mirror the destination principle used for assigning the receipts of tangible personal property. See Pomp, Report of the Hearing Officer: Multistate Tax Compact Article IV [UDITPA] Proposed Amendments (October 25, 2013), p 57, available at <http://www.mtc.gov/uploadedFiles/Multistate_Tax_Commission/Pomp%20final%20final3.pdf> (accessed March 19, 2020). In his report, Professor Richard Pomp noted that "[t]he destination principle . . . is hard to mimic in the case of services," and that "[s]ervices (and intangible property) present different—and more difficult considerations." *Id*. at 62. He outlined a number of problems that could arise depending on how the concept of "delivery" is defined:

15

requires that the sale of services and other intangibles be calculated on the basis of *where* the recipient receives the benefit, either in state or out of state. And this approach reflects an evolution of tax policy from an origin-based approach to a market-based sourcing approach. In light of this brief historical context underlying the sale of services in the realm

> [S]uppose an architectural firm performs its design services in State A, for a corporate client based in State B, involving a project in State C. The firm sends drawings to the corporate contact as an e-mail attachment. Where does delivery take place if the client downloads the attachment while on a plane, at home, or at a hotel? What if the architectural firm makes the drawings available at its web site, located on a server in State D, which is accessed by the client while in State E? In which state did delivery take place and how would the firm know?
>
> What if the drawings are delivered in hard copy to the client's office in State B, or handed to the client when she visits the firm in State A? Does it matter that the project is in State C? For a rule on delivery to be workable it cannot require information unknown to the provider. A sound rule must also not be easily manipulated.
>
> A sound definition of "delivery" should not allow the firm's receipts (its fees) to be assigned to a state under tenuous, fortuitous, or serendipitous circumstances, having little to do with any reasonable policy considerations underlying how income should be apportioned. Moreover, any rule for assigning sales should not be easily susceptible to manipulation by the taxpayer.
>
> If the scenarios above can result in assigning the service fee to different states, the place of delivery could become elective. Digital services could be delivered to low-tax jurisdictions and retransmitted. To be sure, this same possibility exists under the destination principle in Act Art. IV.16, (especially with boats and planes) but in the case of services, there are fewer transaction costs and constraints on the place of delivery, which facilitates tax planning. It is tempting to use the customer's billing address as an acceptable proxy for "delivery," at least in the case of individuals who have less opportunity to change it in cooperation with the service provider and the regulations should address this possibility. [*Id*. at 63-64.]

16

of multistate-business taxation, we turn again to the UCITO, in particular its calculation of the revenue factor.

## C. "RENDERED" IN CONTEXT

To resolve this dispute, we must consider the definitions of relevant statutory terms and central to this is the definition of "rendered." In particular, the revenue factor requires the calculation of "gross revenue of the taxpayer derived from sales made and services *rendered* in the city[.]" MCL 141.623 (emphasis added). The statute does not define "rendered," but this Court generally gives undefined terms their plain and ordinary meanings and may certainly, and properly, consult dictionary definitions in giving such meaning. *Oakland Co Bd of Co Rd Comm'rs v Mich Prop & Cas Guaranty Ass'n*, 456 Mich 590, 604; 575 NW2d 751 (1998). The parties strongly disagree as to how we should define "rendered." Honigman argues that this Court should affirm that "render" means "to transmit to another: DELIVER."[20] *Merriam-Webster's Collegiate Dictionary* (11th ed). Applying this definition, Honigman asserts that "services rendered in the city" under the

---

[20] It is not altogether clear which rule Honigman is urging us to adopt. According to its brief, Honigman allocates its revenue based upon the client's billing address. (Presumably, although it is unclear from the record, this would include all such receipts, regardless of whether the work was performed by Honigman's attorneys in Detroit or elsewhere.) Moreover, Honigman's Director of Financial Services has stated in a sworn affidavit that to prepare its income tax return, "Honigman's accounting system compiled a summary of revenue by client. All revenue from clients located within the city was treated as in-city revenue." The percentage of revenue from Detroit clients represented roughly 11% of the total revenue for all clients. However, Honigman urges us to affirm the Court of Appeals, which held that the relevant consideration is the delivery location, i.e., "where the service is delivered to the client." *Honigman*, 322 Mich App at 675. But these understandings represent distinctive approaches to market-based sourcing. See Schadewald, *supra* note 15.

17

revenue factor encompasses only services that are actually *delivered* to a client located in Detroit. In contrast, the city argues that "render" means "to do (a service) for another," *id*., encompassing all services done within the city.[21] And the difference between these respective interpretations lies in their contrary verbal understandings-- "deliver" versus "to do"-- which, not surprisingly, lead to markedly disparate tax consequences.[22]

Both parties' arguments appear to articulate plausible interpretations of the statute. However, in order to determine the most reasonable meaning of statutory language, such language cannot be read in isolation or in a manner disregardful of context; this Court will not extract words and phrases from within their context or otherwise defeat their import as drawn from such context. *G C Timmis & Co v Guardian Alarm Co*, 468 Mich 416, 421; 662 NW2d 710 (2003). A statute should be interpreted in light of the overall statutory scheme, and "[a]lthough a phrase or a statement may mean one thing when read in isolation, it may mean something substantially different when read in context." *Sweatt*, 468 Mich at 179-180. And in this case, where "rendered" is read in context, we believe

[21] This approach effectively aligns with the origin test, i.e., where the service was performed or completed.

[22] The Tribunal concluded that because the revenue factor is capable of being understood in distinctive ways and, as a result, its proper understanding is not altogether certain, the statute is "ambiguous" and "judicial construction" is necessary. Under this rationale, however, most statutes, in particular those that culminate in litigation, could be characterized as ambiguous. However, it is entirely commonplace that a statutory term or provision is susceptible to multiple not-unreasonable definitions. "[A]mbiguity is a finding of last resort" and it should "be reached only after all other conventional means of interpretation have been applied and found wanting." *Kendzierski v Macomb Co*, 503 Mich 296, 311; 931 NW2d 604 (2019), quoting *Mayor of the City of Lansing v Pub Serv Comm*, 470 Mich 154, 165 & n 6; 680 NW2d 840 (2004) (quotation marks omitted). After assessing the disputed language in context, we believe that MCL 141.623 is unambiguous.

18

that the city's definition constitutes the more appropriate understanding and that the Court of Appeals erred by reversing the Tribunal. The term "render," in our judgment, most precisely means "to do (a service) for another," *Merriam-Webster's Collegiate Dictionary* (11th ed), and thus the revenue factor does not focus upon where the services are delivered but where they are done or carried out.[23] To reach this conclusion, it is necessary that we view "rendered" in context and analyze, respectively: (1) the revenue factor to determine how it treats "services rendered" and (2) the language within broader provisions of the relevant tax framework to assess which definition of "render," among several that might be viewed in isolation as "reasonable," most closely harmonizes with the overall statute.

## 1. REVENUE FACTOR

We look first to § 23, the revenue factor, because it contains the pertinent language in dispute, encompassing revenue earned for both "sales made and services rendered in the city . . . ."[24] Specifically, § 23 provides that "the taxpayer shall ascertain the percentage which the gross revenue of the taxpayer derived from *sales made* and *services rendered* in the city is of the total gross revenue from sales and services wherever made or rendered during the period covered by the return." MCL 141.623 (emphasis added). "When interpreting a statute, we must 'consider both the plain meaning of the critical word or

---

[23] We recognize the similarity between the definitions we give to "rendered" and "performed"-- "rendered" means "to do (a service) for another" while "performed" means "to carry out an action . . . ," *Merriam-Webster's Collegiate Dictionary* (11th ed). We also recognize that these terms commonly refer to the location at which the service is done or carried out.

[24] See *Danse Corp*, 466 Mich at 181-182 ("We are required to examine the plain language of the involved statutes.").

phrase as well as its placement and purpose in the statutory scheme.' " *Sweatt*, 468 Mich at 179 (some quotation marks and citation omitted). And the entirety of the revenue factor's consideration of "services rendered" is contained in this single sentence. In contrast, the Legislature affords considerable additional guidance regarding "sales made," more clearly specifying what is meant by "sales made in the city" as it pertains to the "delivery" of goods: "In the case of delivery of goods in the city to a common or private carrier or by other means of transportation, the place *at which the delivery has been completed* is considered as the place at which the goods are received by the purchaser." MCL 141.623(1) (emphasis added). The Legislature then sets forth five nonexhaustive examples to give further illustration, e.g., "[s]ales to an out-of-city customer with shipments or deliveries to the customer's location within the city are considered sales made in the city," MCL 141.623(1)(d), but "[s]ales to an out-of-city customer with shipments to an out-of-city destination are considered out-of-city sales," MCL 141.623(1)(e).

The Court of Appeals concluded that because gross revenue from the sale of goods is predicated on where those goods are *delivered*, gross revenue from "services rendered" should *also* be predicated on such delivery on the basis that goods and services are both accounted for under the revenue factor. *Honigman*, 322 Mich App at 671-673. However, "words in a statute should not be construed in [a] void, but should be read together to harmonize [their] meaning, giving effect to the act as a whole." *Gen Motors Corp v Erves (On Rehearing)*, 399 Mich 241, 255; 249 NW2d 41 (1976) (opinion by COLEMAN, J.). And in the instant regard, the guidance afforded by the Legislature was specifically for the purpose of determining "sales made in the city," which pertains to the delivery of goods, not services. MCL 141.623(1). Respectfully, we do not believe the Court of Appeals was

20

correct in relying upon the guidance of the Legislature in connection with "sales made" to conclude that "services rendered," focused upon the delivery of services, must be understood in the same manner. Rather, we conclude that even *though* revenue from "sales made in the city" is focused upon where the goods are delivered, revenue from "services rendered in the city" is *instead* focused upon where the services are done or carried out.

Indeed, if the Legislature had intended to treat services in a similar manner to the sale of goods, it might well have seen fit to provide similar, if not identical, guidance and similar, if not identical, examples by which to illustrate how such services are delivered and when the delivery of services should be considered in-city versus out-of-city, while clarifying difficult or counterintuitive situations that might occur in relation to where services are being "delivered" to clients.[25] Instead, the Legislature made clear that the calculation of sales made in the city looks to the place at which the delivery has been completed and § 23 then provides illustrations that "may serve as a guide for determining sales made in the city[.]" MCL 141.623(1). Thus, for the sale of goods, this provision expressly adopted a market-based sourcing rule that focuses upon the delivery location of

---

[25] At oral argument, this Court presented the attorneys with a number of factual scenarios involving the "delivery" of services in an effort to better understand just how one "delivers" an intangible service to another. For example, how does one "deliver" services that relate to no tangible object at all, such as the repair of a dishwasher? Or what if the service is being delivered to a client with principal locations both inside and outside of the city? Or is the taxpayer allowed to select which among a client's locations a service is to be delivered? And what if the client is an out-of-state insurance company and the law firm is charged with the representation of the client's insured who is located inside or outside of the city, or in both? These questions are indicative that the delivery of services is not in all instances an intuitive concept or one easily understood absent statutory guidance. See Pomp at 63-64, *supra* note 19.

the shipment.[26]   But the Legislature did not define "services rendered in the city" in a similar fashion or otherwise provide a market-based sourcing standard for the sales of services as it did later when it adopted the MBTA in 2007 or restored the state corporate income tax in 2011.[27]   Had the Legislature intended to ground the calculation of "services rendered in the city" upon where the service was delivered, it could have expressed this intention in plain terms, or even in similar terms to those it used with regard to the sale of goods and then provided similar examples that would "serve as a guide for determining services rendered in the city," MCL 141.623(1).  Yet the Legislature did none of this.  And contrary to Honigman's premise, there is simply no textual evidence or other reason to believe that the Legislature intended "sales made in the city," and the additional guidance afforded to "sales made," to be understood indistinguishably with the sale of services.[28]

---

[26] This has always been the dominant approach for sales of tangible personal property, see *Construing the Uniform Division of Income for Tax Purposes Act*, 45 U Chi L Rev at 774, n 38 (noting that by 1978, "[t]he destination test of attribution of receipts from sales of tangible personal property [was] used in whole or in part in 42 of the 45 jurisdictions (44 states and the District of Columbia) that employ a sales or receipts factor in their apportionment formulas").

[27] See MCL 208.1305(2)(a); MCL 206.665(2)(a).

[28] Indeed, the Legislature understood well how to afford guidance concerning the calculation of the three factors under the business allocation percentage method.  Under the payroll factor, the Legislature supplies "examples" that "serve as a guide for determining the amount to be treated as compensation for services performed within the city[.]"  MCL 141.622.  Specifically, these examples address how to calculate the payroll factor based upon specific forms of compensation for the performance of services, i.e., compensation for the amount of time worked, the volume of business secured, or "other results achieved."  Thus, the Legislature knew precisely how to supply guidance where necessary, as it had done under the payroll factor.  If the Legislature intended to equate the sale of services with the delivery of that service, it could have made this clear and afforded the guidance necessary to calculate revenue based upon the delivery of services.

"Services rendered in the city," in our judgment, most naturally communicates the venue at which services have been done or carried out, not the venue at which services are delivered, and we are not persuaded, absent further guidance from the Legislature, that the treatment of the delivery of goods under the revenue factor communicates that "services rendered" is the equivalent of "services delivered." Where "rendered" means simply "to do (a service) for another," *Merriam-Webster's Collegiate Dictionary* (11th ed), the calculation of revenue from services rendered in the city is straightforward; the law inquires where those services were *done* and not where they were *delivered*.[29] Accordingly, we agree with the Tribunal that under § 23, "rendered" means "to do (a service) for another,"

---

[29] Honigman never adequately explains, in our judgment, why, even if this Court agreed that the Legislature adopted a market-based sourcing rule for the sale of services, we should hold that it selected the billing location of the customer, i.e., the option employed in practice by Honigman, as opposed to the location at which the services are delivered, i.e., the rule adopted by the Court of Appeals, or the location at which the benefit of the services is received, i.e., the rule adopted by the Legislature in the MBTA and in our restored corporate income tax. As Professor Pomp explained in his report to the Multistate Tax Commission, if a taxing jurisdiction adopts a delivery rule for the sale of services, much still depends upon the precise definition of "delivery" that is selected. See *supra* note 19. Therefore, even assuming that the Legislature adopted a delivery rule, the statute contains no textual clues that would assist us in determining which specific market-based sourcing rule it selected. Furthermore, even assuming that the additional guidance supplied in the statute for the sale of tangible personal property was intended also to serve as guidance, no textual clues in that subsection have been identified that would lead to the conclusion that the Legislature intended to adopt a market-based sourcing rule based upon the customer's billing address as opposed either to a rule based upon the location at which the services are delivered or the location at which the benefit of the services is received (options that appear more reflective of the rule adopted by the Legislature for the sale of tangible personal property). Finally, it is worth noting that the particular market-based sourcing rule apparently advocated by Honigman-- one in which sales of services are sourced based upon the customer's billing address-- has never, to the best of our knowledge, been expressly adopted in any Michigan taxing statute.

23

*id.*, and the calculation of the revenue factor is based upon where the service has been performed, i.e., done or carried out, not where the service was ultimately delivered.

## 2. TAX FRAMEWORK

We next turn to a review of the UCITO's overall framework to determine which definition of "render" best harmonizes with the statute as a whole. To be sure, language in a statute "must be read in context with the entire act, and the words and phrases used there must be assigned such meanings as are in harmony with the whole of the statute, construed in the light of history and common sense." *Sweatt*, 468 Mich at 179 (quotation marks and citation omitted). In doing so, we also look beyond the revenue factor to other provisions of the statute that are relevant for the purpose of giving meaning to the term "rendered." In particular, the phrase "services rendered in the city," and slight variations of this phrase, appear numerously in provisions that pertain to the apportionment of the net profits of a business, and we believe the Legislature's use of this language is further indicative of an intention to calculate revenue from "services rendered," based upon where the service is done or carried out.

This phrasing first appears in MCL 141.612(b), which provides that for resident individuals the tax at issue applies to "a distributive share of the net profits of a resident owner of an unincorporated business, profession, enterprise, undertaking or other activity, as a result of work done, *services rendered* and other business activities *wherever conducted.*"[30] (Emphasis added.) In other words, for resident individuals, the tax applies to pass-through income regardless of where the revenue-producing business activity

---

[30] A "resident" is defined as "an individual domiciled in the city." MCL 141.609(1).

occurs. As it applies, however, to nonresident individuals and corporations, the UCITO is less agnostic about the situs of the revenue-producing income activity. In that regard, the act provides that the tax only applies to net profits resulting from "work done, *services rendered*, and other business activities conducted *in the city*." MCL 141.613(b) (emphasis added). And for "a corporation doing business in the city," the tax similarly applies only to "such part of the taxable net profits as is earned by the corporation as a result of work done, *services rendered* and other business activities conducted *in the city . . . .*" MCL 141.614 (emphasis added). In other words, for these categories of taxpayers, the tax only applies where the profit-earning business activity takes place in the city.

Similar phrasing appears in MCL 141.618, which provides the road map for determining which portion of the net profit of a business, such as that of Honigman, is attributable to the city. It provides that "the portion of the entire net profit, earned as a result of work done, *services rendered* or other business activity conducted *in the city*" (emphasis added), shall be determined by the separate accounting method, MCL 141.619; the business allocation percentage method, MCL 141.620 through MCL 141.624; or an alternative method of accounting approved by the administrator, MCL 141.625. And the phrase appears yet again in MCL 141.620, the provision setting forth, *inter alia*, how the business allocation percentage method is calculated: "The entire net profits of such taxpayer earned as a result of work done, *services rendered* or other business activity conducted *in the city* shall be ascertained by determining the total 'in-city' percentages of property, payroll and sales." (Emphasis added.) Together, §§ 18 and 20 establish the framework upon which city taxes are to be calculated under the business allocation percentage method where the net profits of a business derive from activities conducted both

25

inside and outside of the city. Stated otherwise, only that portion of net profits from business activities conducted within the city is subject to the city tax.

An assessment of these provisions makes reasonably clear that the general inquiry relating to the apportionment of the net profits of a business focuses upon *where* the profit-earning business activity takes place. And that is also the specific inquiry dictated by the first two apportionment factors. In calculating the property factor, it must be determined which properties are "situated within the city." MCL 141.621. And in calculating the payroll factor, it must also be determined which services were "performed within the city." MCL 141.622. Each of these factors-- concerning a taxpayer's capital investment and labor costs-- are clearly focused upon the location of the profit-earning business activity.

Returning again to the revenue factor, we believe that the phrase "services rendered in the city" is also focused upon the location of the profit-earning business activity, which in the instant case is comprised of the legal work performed, i.e., done or carried out, by Honigman attorneys. In other words, where the revenue factor is read in context alongside the other two apportionment factors, in addition to other broader provisions of the UCITO that employ the same phrase "services rendered," we are convinced that the apportionment of revenue under this factor is also determined on the basis of the location at which the business activity-- in this case, the legal work-- has taken place. Accordingly, "services rendered" under the revenue factor encompasses revenue for all services performed, i.e., done or carried out within the city, even when those services were performed for out-of-

city clients. And in this way, the Legislature has effectively adopted an "origin test" for services under the revenue factor.[31]

## D. "PERFORMED" & "RENDERED" IN CONTEXT

We recognize that the Legislature's use of the distinctive terms "performed" and "rendered" within the same tax statute might reasonably suggest, as the Court of Appeals

---

[31] Honigman argues against the Court's conclusion that the Legislature adopted an "origin test" for the sale of services on the basis that it would result in duplication of the payroll factor. This critique is not new-- as noted earlier, the Uniform Law Commissioners offered a similar one during discussions leading to the adoption of the UDITPA in 1957. See *Construing the Uniform Division of Income for Tax Purposes Act*, 45 U Chi L Rev at 773-774 (noting that the commissioners were "of the opinion that [a sales factor with an origin test] would merely duplicate the property and payroll factors which emphasize the activity of the manufacturing state") (quotation marks and citation omitted; alteration in original). But as already noted, that criticism did not preclude the UDITPA drafters or our Legislature from expressly adopting such a test for the sale of services. See *supra* note 13. While creating an apportionment scheme free entirely of overlapping factors may conceivably be a preferable or a more logical taxing approach, "[p]erfect solutions are seldom to be found in tax policy questions; in most cases, adequate solutions are the best that can be devised." Lynn, *The Uniform Division of Income for Tax Purposes Act*, 19 Ohio St L J 41, 53 (1958). In recent decades, the goal of a uniform apportionment methodology has increasingly given way to policy concerns about economic development and, as a result, states have been moving away from an equally weighted three-factor apportionment formula toward a more heavily weighted receipts factor. See Hellerstein, *Lessons of US Subnational Experience for EU CCCTB Initiative*, A Common Consolidated Corporate Tax Base for Europe (Schön, Schreiber & Spengel eds), p 153 ("Today roughly three-quarters of the states with corporate income taxes place at least half the weight on receipts and close to a dozen have moved or are in the process of moving towards a formula based entirely on receipts."). Since this critique has not thus far prevented the adoption of an "origin test" for the sale of services within other taxing statutes, it would be unwarranted for us to conclude that this consideration precludes such a reading of the UCITO. In any event, we are not aware of any rule of interpretation (and none here has been offered) that disfavors an otherwise-reasonable interpretation of a taxing statute that yields to some degree overlapping apportionment factors. Indeed, the argument in this regard is not an argument of interpretation at all but an argument of policy, better directed to the Legislature.

concluded, that the Legislature intended these terms to have distinctive meanings--

specifically, that "perform" signifies "to carry out an action" and "render" signifies "to

deliver." After all, "[w]hen the Legislature uses different words, the words are *generally*

intended to connote different meanings." *US Fidelity & Guaranty Co v Mich Catastrophic

Claims Ass'n (On Rehearing)*, 484 Mich 1, 14; 795 NW2d 101 (2009) (emphasis added).[32]

And this Court is well aware that it should avoid, when reasonably possible, the adoption

of essentially synonymous definitions of distinctive terms without the most careful

consideration of how those terms will come to be understood within a statutory scheme.

However, this maxim of jurisprudence is a "general rule" and "may not apply in every

situation." *Bauserman v Unemployment Ins Agency*, 503 Mich 169, 184 n 10; 931 NW2d

---

[32] There are, however, a variety of exceptions to this general rule, for the "general rule" is perhaps better described as a default "presumption." Most relevantly, this Court will not attribute distinctive meanings to distinctive terms where, in viewing these terms in context, the coherence of the statutory provision as a whole would be undermined. A statute must be read in its entirety and words must be assigned meanings that are in harmony with the whole of the statute. *Sweatt*, 468 Mich at 179. More specific exceptions may also pertain in circumstances (a) in which two words necessarily have the same commonly understood meaning, see, e.g., *People v Thompson*, 477 Mich 146, 153-154; 730 NW2d 708 (2007) (concluding that "keep" is synonymous with "maintain," and "that these two terms are separated by the word 'or' does not give [this Court] the authority to give these two terms distinctive meanings when they are commonly understood to have the same meaning"); (b) in which different words constitute synonyms used to convey varying degrees of the same conduct, see, e.g., *People v Greene*, 255 Mich App 426, 440; 661 NW2d 616 (2003) (finding that "impede" and "prevent" are synonyms presenting "only degrees of difference in the same conduct"); (c) in which words located within a listing have related meanings, see, e.g., *Rovas*, 482 Mich at 114-115 (defining "mislead," "deceive," and "false" in a similar fashion by applying *noscitur a sociis*, which is " 'the principle that words grouped in a list should be given related meaning' "), quoting *Griffith v State Farm Mut Auto Ins Co*, 472 Mich 521, 533; 697 NW2d 895 (2005); or (d) in which a legislative body has sought in a thesaurus-like manner to list as many similar terms as possible in an effort to ensure that no semantic gaps are left regarding some intended element of statutory breadth or coverage.

539 (2019) (emphasis omitted). And in the final analysis, we believe the Court of Appeals'

reliance upon this single rule of interpretation constitutes a failure to give meaning to the

statute in its entirety and in its overall context. That is, despite the Legislature's use of the

distinctive terms "performed" and "rendered," we believe these terms should be understood

as having *similar* meanings within the statute. "Performed" as employed in § 22 means

"to carry out" and connotes a similar meaning as "rendered" in § 23, meaning, in context,

"to do (a service) for another." *Merriam-Webster's Collegiate Dictionary* (11th ed). Thus,

we believe the Legislature intended that both revenue for "services rendered in the city"

and compensation for "services performed within the city" be calculated in a *similar*

manner-- each predicated upon where the service has been done or carried out. The Court

of Appeals rejected the same conclusion as it dutifully grappled with the meanings of these

terms-- "Why would the Legislature use the word 'render' to mean 'perform' by way of

the verb 'to do,' when it would have been much simpler and clearer to simply reuse the

§ 22 word 'perform'?" *Honigman*, 322 Mich App at 674.

To be clear, we do not conclude the two terms possess identical meanings, just as

we do not conclude they possess entirely distinctive meanings. Rather, we conclude the

terms are *similarly* defined-- in which each looks in common to *where* a service has been

done or carried out-- but nonetheless each is to be given a *distinctive* connotation from the

distinctive context in which each is situated within the statute. That is, review of the

UCITO evidences that the Legislature consistently uses "performed" in provisions

referring to the actions of an employee in relation to his or her compensation and that the

Legislature consistently uses "rendered" in provisions referring to the completion of

29

professional services for another-- in particular, on behalf of a client-- and thus that pertain to business or firm earnings, such as profits and revenues.

This contextual distinction is perhaps best illustrated by the confluence of §§ 22 and 23. Section 22 pertains to "the total *compensation* paid to employees for work done or for *services performed* within the city . . . ." MCL 141.622 (emphasis added). This language connects the employee's performance of services to his or her compensation from the employer. However, § 23 pertains to the "gross *revenue of the taxpayer* derived from sales made and *services rendered* in the city . . . ." MCL 141.623 (emphasis added). This language does not pertain to the employee's performance of services but instead connects the taxpayer's revenue to the process by which the business or firm provides services for others, in particular, to its clients.[33] And despite the distinctive contexts in which these terms are used, both compensation for "services performed within the city" under § 22 and revenue derived from "services rendered in the city" under § 23 are calculated in a similar manner, based upon where the services have been done or carried out.[34]

---

[33] This contextual distinction is further illustrated in considering the definition of "compensation" under MCL 141.604(2) in conjunction with the payroll factor. Compensation is defined as "salary, pay or emolument given as compensation or wages for work done or services *rendered* . . . ." MCL 141.604(2) (emphasis added). When incorporating the definition of "compensation" into the payroll factor, it is clear that this factor is calculated based upon the "compensation or wages for work done or services rendered," *id*., that is "paid to employees for work done or for services performed within the city," MCL 141.622. Again, the Legislature's use of "rendered" pertains to services done for another, while the use of "performed," although it pertains to those same services, does so in the specific context in which those services have been carried out on behalf of, and in exchange for, an employee's compensation from his or her employer.

[34] While these two provisions provide the most pertinent example, our review of the UCITO reveals that many of its provisions evidence this same distinction in which the Legislature has clearly employed "services performed" and "services rendered" in the same

And thus in response to the Court of Appeals, it is *this* contextual distinction that underlies the Legislature's rationale of employing separate terms throughout the statute even where these terms are intended to have an essentially *common* meaning and focusing the UCITO's analysis upon where a service has been performed or carried out, not where it has been finally delivered. And it is this same contextual distinction that allows this Court ultimately to set aside the usual interpretive presumptions arising from the Legislature's use of two such closely related terms as "performed" and "rendered." Our recognition of the textual relationship of these terms as they appear within the UCITO is not a matter of mere academic or philological scholarship but rather explains precisely why a jurisprudential proposition of great pedigree and logic-- one understandably given credence by both the Court of Appeals and Honigman, a law firm of great distinction-- should be held inapplicable in the present case, despite the fact that this same proposition was most likely applied to cases decided last month and will most likely be applied to cases decided next month. The inapplicability of this proposition in the instant case is merely illustrative that there are sometimes competing interpretative propositions that must be balanced and harmonized in order for the Legislature's genuine intentions to be faithfully discerned. We are confident that we have done what is proper in applying principles of textual interpretation to this dispute and in reaching an understanding of the statute that is in closest accord with the intentions of the lawmaking branch of our government. As a

---

contextual manner. "Rendered" is consistently used in referring to the taxpayer's earnings for services done for another, as evidenced by MCL 141.623; MCL 141.618; MCL 141.620; MCL 141.612; MCL 141.614; and "performed" is consistently used in referring to compensation for services performed by an employee, as evidenced by MCL 141.622; MCL 141.651(b); MCL 141.654; MCL 141.657(2)(b).

31

result, we are not persuaded by the Court of Appeals that the use of distinctive terms within the UCITO necessarily communicates, as that Court believed, a legislative intention thereby to communicate distinctive meanings to the critical terms in this case, "perform" and "render."

And to further respond to the Court of Appeals, it is this same contextual distinction that also explains why the Legislature did not intend these two terms to have *identical* meanings. The distinctive contexts in which these terms appear not only explain *why* the Legislature has employed separate terms to describe a common legal approach to determining which services are taxable, and which are not, but *why* the distinctive connotations of these terms must be respected and maintained and why "performed" and "rendered" cannot be viewed as simply interchangeable throughout the statute-- the terms have distinctive connotations, or "suggestive significance[s]," *Webster's New Collegiate Dictionary* (1960), in which at least for purposes of the present statute, "performed" relates only to an employee's compensation for services carried out for an employer and "rendered" relates only to earnings, such as net profits, derived from services done on behalf of clients.

## IV. CONCLUSION

We conclude that upon close review of the UCITO, it is reasonably clear that "rendered" means, as set forth by the city of Detroit, "to do (a service) for another," and not, as set forth by Honigman, "to transmit to another: DELIVER." *Merriam-Webster's Collegiate Dictionary* (11th ed). Thus, the Legislature adopted an "origin test," rather than a destination or market-based test, for the calculation of revenue from "services" under the

32

revenue factor.  Section 23 encompasses all legal services performed, i.e., done or carried out, within the city without regard to where those services are delivered.  In so holding, we acknowledge that the terms "performed" and "rendered" generally have similar meanings and are effectively equivalent in their relative purposes within the statute.  However, the distinctive contexts in which these terms appear accounts for the use of different words despite their similar meanings.  In all, it is the interpretation of the city, rather than that of Honigman, in our judgment, that sets forth the most reasonable understanding of the revenue factor and that is most harmonious with the statutory framework as a whole.  Accordingly, the Court of Appeals erred when it held that the determinative consideration under § 23 is where, in the end, the services are delivered to the client.  Therefore, we reverse the judgment of that Court and remand to the Tribunal for further proceedings.

Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Megan K. Cavanagh

33

STATE OF MICHIGAN

SUPREME COURT

HONIGMAN MILLER SCHWARTZ AND
COHN, LLP,

   Petitioner-Appellee,

v             No. 157522

CITY OF DETROIT,

   Respondent-Appellant.

_____

VIVIANO, J. (*concurring*).

I concur in the majority's holding that MCL 141.623 encompasses all legal services done or carried out in the city. And I agree with much of the analysis leading to that holding, in particular the historical discussion and comparative analysis of the Uniform City Income Tax Ordinance (UCITO), MCL 141.601 *et seq*., and Michigan's analogous state-taxation statutes. I part ways, however, with the majority over Part III(D) of the opinion, which confusingly endeavors to create ever-so-slight daylight between the terms "render" and "perform," characterizing them as "similar" but not the same. I write to explain why this effort fails, why it is unnecessary, and why it undermines the majority's conclusion that, as used in the UCITO, these terms mean the same thing.

It is helpful, at the outset, to keep in mind what this Court is called upon to decide in the case. The issue is whether the phrase "services rendered" in § 23 of the UCITO, MCL 141.623, includes work "performed" in the city of Detroit for clients outside the city, despite the fact that § 22 of the UCITO, MCL 141.622, expressly employs the phrase

"services performed." Courts usually adhere to the presumption of consistent usage, which holds that different words have different meanings.[1] The Michigan Tax Tribunal concluded that the presumption did not apply here because the "difference [in wording] reflects nothing more than the syntax of the English language." The Court of Appeals disagreed, hewing to the general consistent-usage presumption and differentiating the definitions of "rendered" and "performed" by interpreting the former as focusing on where services were delivered to a client.[2]

Through most of its opinion, including at the end, the majority seems to conclude that the terms have the same meaning. It defines "performed" to mean " 'to carry out an action . . . .' "[3] "Render," according to the majority, means " 'to do (a service) for another[.]' "[4] Given these definitions, the majority concludes that "services rendered," in the context of § 23, "encompasses revenue for all services performed, i.e., done or carried out within the city[.]"[5] To this point in the opinion—before the discussion of the terms' supposed distinctive connotations—the majority ably explains the textual, contextual, and

---

[1] See notes 8 and 9 of this opinion and the accompanying text.

[2] *Honigman Miller Schwartz and Cohn LLP v Detroit*, 322 Mich App 667, 673-675; 915 NW2d 383 (2018).

[3] *Ante* at 10 n 7, quoting *Merriam-Webster's Collegiate Dictionary* (11th ed).

[4] *Ante* at 19, quoting *Merriam-Webster's Collegiate Dictionary* (11th ed); see also *ante* at 32.

[5] *Ante* at 26; see also *ante* at 2 ("[W]e conclude that § 23 encompasses all legal services performed, i.e., done or carried out within the city without regard to where those services are delivered . . . ."); *ante* at 33 ("Section 23 encompasses all legal services performed, i.e., done or carried out, within the city without regard to where those services are delivered.").

historical bases for its interpretations.[6]  And it is this analysis that provides the holding and relevant interpretations, which are repeated in the introduction, body, and conclusion of the majority opinion.  It is hard to imagine a plainer way of saying that "services rendered" means "services performed."  At times, the majority acknowledges that the definitions it lands on—ones with which I largely agree—mean essentially the same thing.[7]  And because this is enough to decide that "rendered" refers to the place of performance, not to the place of delivery or benefit, the majority's interpretive task should be complete.

For the majority, however, it is not.  Instead, it labors on, in search of a meaningful distinction between the two terms.  Why?  Not because the distinction it discerns directly affects the outcome; by the time it reaches this portion of its contextual analysis, the majority has already adopted the crucial definitions that dispose of the case.  Rather, the majority spins its interpretive wheels to avoid the presumption of consistent usage.  As

---

[6] See *ante* at 7-27.

[7] See *ante* at 33; see also *ante* at 29 ("[W]e believe these terms should be understood as having *similar* meanings within the statute.").  However, the majority has inconsistently adopted a definition for the intransitive form of "perform" while adopting a definition for the transitive form of "render."  Although it is not clear, it appears both terms are used transitively in the statute.  Using the same dictionary, I would adopt the definition of the transitive form of both words and interpret "perform" to mean "CARRY OUT, DO[.]" *Merriam-Webster's Collegiate Dictionary* (11th ed).  It is also worth noting that while courts should ordinarily use a dictionary contemporaneous with the statute's enactment, see *Ronnisch Constr Group, Inc v Lofts on the Nine, LLC*, 499 Mich 544, 563 n 58; 886 NW2d 113 (2016) ("In ascertaining the meaning of a term, a court may determine the meaning at the time the statute was enacted by consulting dictionaries from that time."), I agree with the majority that the definitions from that period are not meaningfully different from the ones the majority employs in its opinion.  See *Webster's New World Dictionary of the American Language* (1960) (defining "perform" as, among other things, "to carry out"; defining "render" as "to do (a service, etc.)").

noted, under that interpretive principle, words are "presumed to bear the same meaning throughout a text" and "a material variation in terms suggests a variation in meaning."[8] It is a canon this Court applies when appropriate.[9]

The majority labels this "a jurisprudential proposition of great pedigree and logic," but then escapes its grasp by inventing a brand new exception to the canon that it claims is satisfied by the contextual distinction it has identified.[10] "Rendered," the majority explains, is used in contexts describing labor on behalf of another "that pertain[s] to business or firm earnings, such as profits and revenues."[11] By contrast, "performed" appears in the statute when the services relate to an individual's compensation.[12]

I am unpersuaded for several reasons. To begin, the majority's position cannot be reconciled with numerous provisions in the UCITO. Take, for example, MCL 141.604(2), which defines "compensation" as "salary, pay or emolument given as compensation or

---

[8] Scalia & Garner, *Reading Law: The Interpretation of Legal Texts*, (St. Paul: Thomson/West, 2012), § 25; see also 2A Sutherland, *Statutes and Statutory Construction*, § 46:6, p 261 ("Different words used in the same, or a similar, statute are assigned different meanings whenever possible.").

[9] See, e.g., *United States Fidelity Ins & Guaranty Co v Mich Catastrophic Claims Ass'n (On Rehearing)*, 484 Mich 1, 14; 795 NW2d 101 (2009) ("When the Legislature uses different words, the words are generally intended to connote different meanings.").

[10] *Ante* at 31; see also *ante* at 31 ("And it is this . . . contextual distinction that allows this Court ultimately to set aside the usual interpretive presumptions arising from the Legislature's use of two such closely related terms as 'performed' and 'rendered.' ").

[11] *Ante* at 29-30; see also *ante* at 31 n 34 (" 'Rendered' is consistently used in referring to the taxpayer's earnings for services done for another, . . . and 'performed' is consistently used in referring to compensation for services performed by an employee . . . .").

[12] See *ante* at 29.

wages for work done or services rendered . . . ."[13]    Even more directly, nonresident individuals can be taxed under MCL 141.613(a) "[o]n a salary, bonus, wage, commission, and other compensation for services rendered as an employee for work done or services performed in the city."  In a similar manner, MCL 141.665 connects compensation with the term "rendered" by providing tax credits for city residents who "received . . . compensation for work done or services performed or rendered" outside the city and who paid taxes to another municipality on that income.    These provisions contradict the majority's contention that " 'performed' is consistently used"—in contradistinction to "rendered"—"in referring to compensation for services performed by an employee[.]"[14]

More importantly, the majority never gets around to explaining how the distinction sheds light on the semantic content of the terms.  Do the connotations have any bearing on what the words actually mean?  As noted above, context undoubtedly can shed light on a

---

[13] The majority mentions MCL 141.604(2) briefly and only as a prop for its interpretation of § 22, the payroll factor.  It states, "When incorporating the definition of 'compensation' into the payroll factor, it is clear that this factor is calculated based upon the 'compensation or wages for work done or services rendered,' [MCL 141.604(2)], that is 'paid to employees for work done or for services performed within the city,' MCL 141.622." *Ante* at 30 n 33.  Without more, the majority proclaims that this simple substitution proves its point.  But I do not see how.  Incorporating the full definition of "compensation" into § 22 would create a redundancy at best and be nonsensical at worst: "the taxpayer shall ascertain the percentage which the total ['salary, pay or emolument given as compensation or wages for work done or services rendered'] paid to employees for work done or for services performed . . . ."    MCL 141.622, inserting the MCL 141.604(2) definition of "compensation."  All this shows, to my mind, is that the terms "performed" and "rendered" are interchangeable.

[14] *Ante* at 31 n 34.

---

5

word's meaning.[15] But here, the connotations are not even mentioned in the critical passages of the majority opinion that determine the terms' meanings, and so they are not part of the meanings the majority must compare when considering the presumption of consistent usage, i.e., in deciding whether the definitions are the same for purposes of that canon. Rather, the majority settles on equivalent definitions for the two different terms, then explains how those terms (bearing the same meaning) appear in different contexts, all without varying its interpretation of those terms. As a result, this part of the majority's contextual analysis does not have a bearing on the linguistic meaning of the relevant phrases, and it is therefore not part of any legitimate interpretive effort to uncover statutory meaning.[16]

The majority fails to translate its "*distinctive* connotations" into a meaningful interpretation because, even under the majority's telling, the distinction is diaphanous at best.[17] Stated most simply, the majority's interpretation is that employees "perform"

---

[15] See *King v Burwell*, 576 US ___;135 S Ct 2480, 2497; 192 L Ed 2d 483 (2015) (Scalia, J., dissenting) ("Context always matters. Let us not forget, however, *why* context: It is a tool for understanding the terms of the law, not an excuse for rewriting them.").

[16] See Hutton, *Word Meaning and Legal Interpretation* (New York: Palgrave MacMillan, 2014), p 17 ("In reaching an interpretation, we reach a contextually relevant determination of what the word (phrase, text . . . ) meant."); *Reading Law*, § 1, p 53 ("Any meaning derived from signs involves interpretation . . . . Interpretation or construction is 'the ascertainment of the thought or meaning of the author of, or of the parties to, a legal document, as expressed therein, according to the rules of language and subject to the rules of law.' ") (citation omitted); Sutherland, § 45:3, p 22 ("Every occasion to determine whether, and how, a statute applies in a particular situation is by definition an occasion to interpret it . . . ."); Cooley, *Constitutional Limitations* (5th ed), p *38 (explaining that the purpose of interpretation is to "find[] out the true sense of any form of words").

[17] See *ante* at 29.

services for compensation from their employer but "render" services on behalf of their employer to its clients. In other words, the statute somehow treats as distinct the same work done for the same employers by the same employees. The majority itself acknowledges that the services "performed" under MCL 141.622 are the very same services "rendered" under MCL 141.623.[18] There is no suggestion in the majority opinion that the distinction has any practical significance, such as by distinguishing who or what can be taxed. Indeed, both § 22 and § 23 relate to taxation of business income, not, for example, taxation of the employee's income from "compensation." Thus, even assuming the distinction exists, it offers little insight into how the statute operates.

Because this portion of the contextual analysis leaves the terms' semantic content unchanged, the majority has not pointed to a relevant distinction for purposes of the consistent-usage canon. It has not, in other words, shown that the different terms have different meanings, such that the canon is inapplicable. The majority's efforts instead amount to a demonstration that different terms with the same meaning have (supposedly) been used in different contexts, followed by the conclusion that the consistent-usage presumption can therefore be "set aside."[19] The unstated assumption lurking behind this argument is that if different terms pop up in different contexts—albeit, in close proximity in the same statute—there is no general presumption against giving them the same

---

[18] See *ante* at 30 n 33.

[19] *Ante* at 31. Presumably, by "set aside" the majority means to say that the canon does not apply because the terms are distinct enough that they fall outside the canon's scope. Why else spend pages purporting to uncover a distinction that would otherwise have no bearing on the case? Nothing suggests the majority means that the terms are equivalent but the canon is inapplicable for some other reason.

meaning. I have not come across any such version of the canon. The canon speaks of different terms generally having different meanings—it does not say different terms *used in the same context* generally have different meanings, or that different terms in *different contexts* can have the same meaning. In essence, then, the majority ignores the real canon and creates a straw-canon that does not apply to these circumstances.

And to what end? The canon itself provides the solution. Semantic canons are not absolute rules.[20] They are useful because they capture how language is generally used.[21] But when the ordinary meaning of the text runs contrary to a canon, we must follow the text.[22] The presumption of consistent usage, in particular, is just that: a presumption.[23] It

---

[20] See *Reading Law*, § 3, p 59 ("No canon of interpretation is absolute. Each may be overcome by the strength of differing principles that point in other directions.").

[21] See, e.g., Slocum, *Ordinary meaning: A Theory of the Most Fundamental Principle of Legal Interpretation* (Chicago: University of Chicago Press, 2015), p 186 (noting that canons are justified to the extent they "represent[] the way that language is normally used"); *Reading Law*, § 3, p 59 ("Principles of interpretation are guides to solving the puzzle of textual meaning . . . .").

[22] See *People v Pinkney*, 501 Mich 259, 285 n 63; 912 NW2d 535 (2018) (" '[C]anons of construction are no more than rules of thumb that help courts determine the meaning of legislation, and in interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.' "), quoting *Connecticut Nat'l Bank v Germain*, 503 US 249, 253-254; 112 S Ct 1146; 117 L Ed 2d 391 (1992).

[23] See, e.g., *Kirtsaeng v John Wiley & Sons, Inc*, 568 US 519, 540; 133 S Ct 1351; 185 L Ed 2d 392 (2013) ("We are not aware, however, of any canon of interpretation that forbids interpreting different words used in different parts of the same statute to mean roughly the same thing.").

8

has long been recognized as an imperfect tool for arriving at a text's meaning.[24] "[M]ore than most other canons, this one assumes a perfection of drafting that, as an empirical matter, is not often achieved."[25] Drafters "often (out of a misplaced pursuit of stylistic

---

[24] See, e.g., Black, *Handbook on the Construction and Interpretation of the Laws* (1911), §§ 53-54, p 145 ("But the presumption . . . is not controlling; and where it appears that, by giving it effect, an unreasonable result will follow, and the manifest object of the statute be defeated, the courts will disregard the presumption . . . ."); Bishop, *Commentaries on the Law of Statutory Crimes* (1883), § 95a, p 86 ("In a sort of general way it is sometimes worth considering, that, if a particular word occurs repeatedly in a statute, or in different statutes on the same subject, the meaning may, *prima facie*, be deemed identical in all the places. . . . The presumption is in no form held to be conclusive, and the fact is sometimes very palpably otherwise. Even the same word in a single sentence creating an offence has been adjudged to have different meanings in different parts of the sentence.") (citations omitted); 1 Story, *Commentaries on the Constitution of the United States* (4th ed), § 454, p 335 ("[I]t is by no means a correct rule of interpretation to construe the same word in the same sense wherever it occurs in the same instrument. It does not follow, either logically or grammatically, that because a word is found in one connection in the Constitution with a definite sense, therefore the same sense is to be adopted in every other connection in which it occurs."); Smith, *Commentaries on Statute and Constitutional Law* (1848), § 485, p 631 ("If an expression which is susceptible of different meanings occurs more than once in the same statute, it may not have the same signification in every instance in which it may be used, as it may be governed by the subject matter in its immediate context . . . ."); Lieber, *Legal and Political Hermeneutics* (Boston: Charles C Little & James Brown, 1839), p 119 ("What we have said before includes the rule, that we are by no means bound to take an ambiguous word in that meaning, in which it may occur in another passage of the same text; for words, as is well known, have different meanings in different contexts."); de Vattel, *The Law of Nations* (1787), bk II, § 281, p 379 ("If any one of those expressions that have many different significations, are found more than once in the same piece, we cannot make it a law, to take it every where in the same signification."); Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv L Rev 2118, 2162 (2016) ("Similarly, if two different terms are normally synonyms, requiring them to be interpreted differently makes little sense. . . . When judges hew too closely to this presumption, they may ditch the best reading of a statute and instead improperly invent one of their own."), reviewing Katzmann, *Judging Statutes* (NY: Oxford University Press, 2014).

[25] *Reading Law*, § 25, p 170.

9

elegance) use different words to denote the same concept."[26]   The presumption thus " 'readily yields' " when a fair reading of the text requires.[27]   As the majority recognizes, we have not been wedded to the presumption and instead have concluded in numerous cases that it did not accurately reflect the statute's meaning.[28]

Here, I conclude that the presumption must yield.  The majority opinion, prior to Part III(D), explains why "performed" and "rendered" share a common meaning as used in § 22 and § 23.  What the majority's contextual analysis shows, if anything, is not that the terms bear some ineffable semantic distinction but, rather, that they may have been used for stylistic variety.[29]   As the meaning of "rendered" in § 23 is clear, I would not

---

[26] *Id*.; see also Office of the Legislative Counsel, US House of Representatives, *House Legislative Counsel's Manual on Drafting Style* (Nov 1995), § 102(d)(4), p 3 ("If you have found the right word, don't be afraid to use it again and again.  In other words, don't show your pedantry by an ostentatious parade of synonyms.  Your English teacher may be disappointed, but the courts and others who are straining to find your meaning will bless you.").

[27] *Utility Air Regulatory Group v EPA*, 573 US 302, 320; 134 S Ct 2427; 189 L Ed 2d 372 (2014), quoting *Environmental Defense v Duke Energy Corp*, 549 US 561, 574; 127 S Ct 1423; 167 L Ed 2d 295 (2007); see also *Reading Law*, § 25, p 171 ("Because it is so often disregarded, this canon is particularly defeasible by context.").

[28] See *ante* at 28 n 32 (listing cases).

[29] We do not, however, sit in review of the Legislature's literary style; "we ask only what the statute means."  Holmes, *The Theory of Legal Interpretation*, 12 Harv L Rev 417, 419 (1899); see also *Clam Lake Twp v Dep't of Licensing and Regulatory Affairs*, 500 Mich 362, 373; 902 NW2d 293 (2017) ("Unambiguous statutes are enforced as written."); Manning, *Textualism and Legislative Intent*, 91 Va L Rev 419, 450 (2005) ("The precise wording of any given statute may have been, for unknowable reasons, essential to its passage.  Thus, efforts to augment or vary the text in the name of serving a genuine but unexpressed legislative intent risks displacing whatever bargain was actually reached through the complex and path-dependent legislative process.").

obscure that meaning out of misguided obeisance to an interpretive presumption that, by its own terms, often gives way to relevant context.

For these reasons, I respectfully concur.


David F. Viviano
Bridget M. McCormack
Elizabeth T. Clement